[No. S012852. Apr. 24, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT EDWARD MAURY, Defendant and Appellant.

344

**COUNSEL**

Joseph E. Chabot, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell and Stanley Cross, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—A jury convicted defendant Robert Edward Maury for the first degree murders (Pen. Code, § 187)[1] of Averill Weeden, Belinda Jo Stark and Dawn Berryhill, the assault on Stark with intent to commit rape (§ 220), the robbery (§ 211) of Berryhill, and the forcible rape (§ 261, subd. (2)) of Jacqueline H. It found true special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and robbery murder (§ 190.2, subd. (a)(17)(i)). After a penalty trial, the jury returned a verdict of death, and the trial court imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) As will appear, we affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The Prosecution's Case*

##### a. *Introduction*

The prosecution presented a fact-intensive, circumstantial case of defendant's guilt, which interconnected three murders and the rape of a fourth victim.

A central element in the case was the Shasta County Secret Witness program (Secret Witness), which was established as a telephone "hotline" to

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

receive information from citizens about crimes committed in the county. A month after Weeden's disappearance in 1985, an anonymous caller called the Secret Witness with information on the location of Weeden's body in exchange for reward money. This information led to the discovery of Weeden's body. Although the police suspected that defendant, Weeden's roommate, had been involved in her disappearance and was possibly the Secret Witness caller, there was insufficient evidence of his involvement in Weeden's death or that he was the caller.

In 1986, defendant called the Secret Witness about seeking a reward for information on an unrelated burglary. During the call, defendant identified himself by name. The operator believed that he was the same person who had previously provided information on Weeden.

At the end of June 1987, Berryhill and Stark disappeared. Soon afterwards, the Secret Witness operator received a series of telephone calls from an unidentified caller, whom she believed to be the previous caller. He provided information leading to the discovery of the women's bodies, which were later located in the same rural area, within three-tenths of a mile of each other. The caller again received monetary rewards for the information provided. When the caller retrieved the reward money at a designated drop-off point, the police identified him as defendant. After the police later confronted defendant with this information, he made a series of incriminating statements, which eventually led to his arrest.

### b. *Weeden's disappearance*

In May 1985, Weeden lived in Redding and rented a room in her house to defendant. On Thursday, May 23, Eula Chartier, Weeden's mother, spoke to defendant several times on the telephone inquiring about her daughter's whereabouts. Defendant related that Weeden was at the store. On the last call, defendant exclaimed, "How in the hell am I supposed to know where she is." Unable to locate Weeden, Chartier reported to the police that her daughter was missing.

While searching for his sister, Bill Chartier asked defendant where she was. Defendant gave conflicting stories. Ray Morris, who was with defendant at the Weeden house on one occasion, told Chartier that he last saw Weeden riding off with defendant on the back of his motorcycle.

Assigned to investigate the disappearance of Weeden, Redding Police Detective Dave Mundy spoke with defendant at the police department on June 3, 1985. Defendant appeared to be "relaxed and self-assured" and

denied any involvement in Weeden's disappearance. He related that the last time he had seen Weeden was "either Thursday, Friday, or a Saturday." At that time, defendant drove Weeden on his motorcycle to a telephone booth, left her there while he went to another location to pick up some drugs for Weeden, returned to pick her up, and drove her back to her house. A week later, Detective Mundy spoke again with defendant, who confirmed this account.

c. *The 1985 Secret Witness telephone calls and discovery of Weeden's body*

On June 19, 1985, an anonymous person called the Secret Witness, inquiring as to how much he would receive for information on the location of Weeden's body. Shirley Landreth, who answered most of the incoming calls for the Secret Witness, spoke to this person.

On August 8, 1985, the same person (whose voice Landreth recognized) called and asked again about the amount of reward money he would receive for information on the location of Weeden's body. This time, having received authorization to pay the reward money, Landreth agreed with the caller on the amount. The caller then gave precise directions to a wooded area located off a trail behind an automobile body shop in Redding. In relating the distances, he used the term "meters." Claiming that he knew the identity of the person responsible for the Weeden killing, the caller offered to give information about the "responsible" person if he received his reward money in a timely manner. He also related that there were six unsolved murders in Shasta County and he could give information to solve two others.

Based on the information provided by the caller, the police found Weeden's badly decomposed body. It had been covered with cardboard and what appeared to be an old carpet. An autopsy, performed on August 23, 1985, revealed that Weeden's skull and the bone at the top of her throat had been fractured "at or near the time of death." The medical examiner opined that Weeden died from multiple traumatic injuries; either fracture, independently, or both fractures in conjunction, could have caused Weeden's death. The fractured bone in Weeden's throat was consistent with manual strangulation.

After the discovery of Weeden's body, Landreth received four more telephone calls from the same caller in August 1985. On August 12, the caller said that the person who had lived with Weeden was responsible for her death. Although the caller refused to talk with Detective Mundy, he said he would call back and answer questions that the officer gave to Landreth.

On August 15, 1985, the Secret Witness caller telephoned Landreth as promised. Responding to Detective Mundy's questions, the caller related that the person responsible for Weeden's death was named "Robert" or "Bob" and had rented a room from Weeden; he knew this because he was "sort of with him"; he was Bob's drug connection and had gone with him to collect the money; Bob had provided drugs to Weeden; and when Weeden could not pay for the drugs, Bob went out of control and strangled her with a nylon clothesline obtained from Weeden's backyard. The caller further related that the killing occurred Thursday night on a trail and the body was dragged to where it was found. He refused to admit that he had observed the killing. Landreth asked, "If Bob denies [the involvement], how can we nail him?" The caller responded, "Tell Bob that Dave has talked to Frank" and that "it will scare the hmm [later described as a 'four-letter word'] out of him."[2]

On August 15, 1985, the Secret Witness caller telephoned Landreth again and responded to more questions provided by Detective Mundy. The caller related that Weeden was picked up at dusk and killed with a six- to eight-inch rock at 7:00 or 8:00 p.m. on Thursday; he knew it was Thursday because it had been a relative's birthday; and Bob drove Weeden on his motorcycle while the caller drove his own car. The caller reiterated that Weeden had been strangled beside the trail, dragged to where she was eventually found, hit with a rock to make sure that she was dead, and covered with leaves and branches. Bob returned later and covered Weeden's body with an object such as a blanket, towel, or rug. In describing where the police could find Weeden's glasses, the rope, and the rock, the caller again used the term "meters." When Landreth related that the police were unable to find the rope near the location of the body, the caller said that it could be found next to a shed in Weeden's backyard. The police later found a nylon clothesline there. The caller said that he would check the next day and warned that if he did not receive his reward money, they would not hear from him again.

On August 26, 1985, the same caller telephoned Landreth again. Responding to more questions provided by Detective Mundy, the caller described the clothing Weeden had worn and said that Bob covered the body with a rug. When asked if anyone had seen Bob return to the body, the caller responded that he did not know, although Bob had gone back several times on his dirt bike.

 d. *Defendant's additional statements to the police about Weeden's death*

On September 4, 1985, Detective Mundy spoke with defendant again at defendant's house. Defendant reiterated that he had driven Weeden on his

---

[2]People who knew defendant testified that he used the term "Frank" to refer to a liar.

motorcycle to a telephone booth, left her there while he retrieved some drugs, returned to Weeden, and then brought her back to her house. He believed this occurred on Friday night, May 24, because he recalled that the next day he attended a birthday party for his brother's children.

In November 1985, defendant telephoned Shasta County Sheriff's Detective Chester Ashmun. This time, he offered information on the cause of Weeden's death to the effect that she had been strangled and hit on the head. He wanted consideration on a possession of stolen property charge in an unrelated case and immunity in the Weeden case. Detective Ashmun responded that he might be able to help defendant on the unrelated case. After Detective Ashmun related this information, Detective Mundy telephoned defendant. Defendant offered to talk, conditioned upon receiving immunity on the Weeden case. Detective Ashmun responded that only the district attorney could grant immunity.

The next day, November 21, 1985, Detective Mundy and Shasta County District Attorney Steve Carlton interviewed defendant at defendant's house. Defendant stated that close to the time of his nephews' birthdays, he returned to Weeden's house and found Morris strangling Weeden with a rope. Upon seeing defendant, Morris dropped Weeden. Defendant believed that she was dead. Another man, whom defendant did not know, pointed a gun at defendant. Morris used the same rope to tie defendant's hands. Morris and the other man placed defendant in the back of Weeden's truck with Weeden's body. They drove to the woods where they dumped Weeden's body. Although Weeden was already dead, Morris threw rocks at her body. Defendant convinced Morris not to shoot him by promising the men anything they wanted. After returning to Weeden's house, Morris threatened that if defendant turned them in to the police, they would kill him.[3]

On December 10, 1985, Detective Mundy spoke with defendant again. Defendant repeated how Weeden had been strangled, but said he was not sure if Weeden was dead when Morris dropped her. This time, however, defendant claimed that Morris forced him, at gunpoint, to strike Weeden on the head with a rock to disguise how she died. During the interview, defendant used the term "meters," which led Detective Mundy to suspect that defendant was the Secret Witness caller. When asked if he was the caller, defendant denied it.

e. *The 1986 Secret Witness telephone calls*

On September 11, 1986, over a year after receiving the last telephone call from the Secret Witness caller, Landreth received a telephone call from a

---

[3]By November 1985, the police suspected that defendant was responsible for Weeden's death.

person offering information on a burglary, unrelated to the Weeden case, in exchange for a reward. Landreth recognized the person's voice as the same caller who had made the 1985 anonymous calls regarding Weeden. The caller identified himself as "Bob" or "Robert Maury."

A week later, the same person who had called Landreth about the unrelated burglary, and who Landreth believed had also called in 1985, called again. He wanted immunity on the Weeden case. The Secret Witness calls from this person stopped, but as shown below, resumed in August 1987, after the disappearances of Berryhill and Stark.

In the spring of 1987, defendant called Detective Mundy. Upset because his name had been leaked as a possible informant in an unrelated robbery trial, defendant taunted Mundy that he would never really know what had happened to Weeden and would "take Averill Weeden's death to [Mundy's] grave."

f. *The Jacqueline H. rape*

On June 20, 1987, defendant began talking to Jacqueline H. and introduced himself as "Maury as in hooray." Defendant drove Jacqueline H. on his motorcycle to her friend's house, where she stayed for a few hours. She returned home and then left her house about dusk to go to a fair. About one and one-half blocks from her house, Jacqueline H. saw defendant parked on the side of the road. She wondered why he was there since she had not divulged her home address. Defendant invited Jacqueline H. to a friend's party at the bike trails in Happy Valley. She accepted and he drove her on his motorcycle to the bike trails. Defendant then turned onto a dirt road off Happy Valley Road, drove on some smaller dirt trails for about a mile, and stopped in a clearing in the woods.

When Jacqueline H. saw that there was no one around, she became scared and asked to be taken home. Fearing that she would be killed, Jacqueline H. took her driver's license from her purse and hid it in her back pocket. Initially, defendant said that they should wait for a few minutes. He then placed a rope around Jacqueline H.'s neck and demanded that she remove her clothes as he tightened the slip knot around her neck. After Jacqueline H. removed her clothes, defendant ordered her to lie down. When she complied, he raped her. Afterwards, he drove Jacqueline H. home. Because Jacqueline H. felt that she had no one to turn to, she did not immediately tell anyone about the rape.

In early August 1987, Jacqueline H. told her new boyfriend, Gary Minoletti, about the rape. In late August, after the disappearance of Berryhill,

Jacqueline H. saw defendant drive up to a liquor store on his motorcycle. Recognizing him, Jacqueline H. asked defendant if his name was Bob; he said it was. Defendant asked Jacqueline H. if she was Berryhill. She then went inside the store and told Minoletti that the man who had raped her was outside. When Minoletti confronted him, defendant acknowledged that he was Bob Maury and asked, "Is that Dawn?" When Minoletti replied no, defendant commented that Jacqueline H. looked "just like" Berryhill. Minoletti wrote down defendant's license plate number and reported the rape to the police that night.

Detective Mundy was in charge of the rape investigation and never told Jacqueline H. about the murder of Berryhill.

### g. *The disappearance of Berryhill*

On Monday, June 22, 1987, two days after the rape of Jacqueline H., Berryhill disappeared. Earlier that morning, Berryhill kicked her boyfriend, Mike Brumett, out of her South Market Street apartment. Later, Diana Williams (Berryhill's mother) was babysitting Berryhill's six-month-old baby at Berryhill's apartment and answered the telephone. The caller identified himself as "Bob" and wanted Berryhill to wait for him because he would be a few minutes late. He asked if Berryhill was still living with her boyfriend. When Williams replied no, defendant commented "good," because he intended to rent Berryhill an apartment and would not rent it to her if she was still with her boyfriend.[4]

About 2:00 p.m., not long after receiving a second telephone call from "Bob," Williams left Berryhill's apartment to find her daughter. She saw Berryhill talking to defendant in a park, about two blocks from the apartment. Defendant was sitting on a dark "Honda-type" motorcycle. Berryhill returned to the apartment with Williams. She told Williams that she was going to meet "Bob" at 8:00 p.m., that she had already been with him that day, and that they were going to "Big Mama's house" to buy "pot." Williams left Berryhill's apartment at 3:00 p.m., after giving her $100. That was the last time Williams saw her daughter.

Goldie Lane lived above Berryhill's apartment. About 9:00 p.m., on June 22, 1987, Berryhill asked Lane for a ride to buy some marijuana. Lane replied that her car's lights were not working, but offered to babysit for Berryhill if she could get a ride with someone else. Berryhill accepted and

---

[4]At trial, Williams testified that defendant personally questioned her at the preliminary hearing. She recognized defendant's voice as the person with whom she spoke on the telephone.

said that she could get a ride with a guy on a motorcycle at the liquor store across the street. Several minutes later, Berryhill brought her baby to Lane's apartment and told Lane that she was going to "cop some dope." Lane offered some money, but Berryhill declined because she had enough money. Berryhill showed Lane a roll of money, put it back in her purse, and left. That was the last time Lane saw Berryhill.

That night, Bill Koeller went to Berryhill's apartment to retrieve some of Brumett's clothes for Brumett. Because Brumett thought Berryhill would become upset if he appeared, Koeller dropped Brumett down the street before proceeding to Berryhill's apartment. Koeller spoke to Berryhill in front of her apartment. When it was getting dark, he saw defendant approaching them from the liquor store across the street. Berryhill waved defendant over to her. After defendant approached them and spoke to Berryhill, Koeller decided to leave. As Koeller left the area, he saw Berryhill leaving with defendant on his "Honda-like" motorcycle.

Just before dusk on June 22, 1987, James Horan saw Berryhill in an alleyway near her apartment. Horan wanted to buy marijuana, but Berryhill said she did not have any to sell at that time. While they were conversing, Horan saw Berryhill wave at a man crossing the street toward them. Although Horan gave a general description of the man at trial, he could not identify defendant as that man; he was too far away.

Because defendant matched the description of the man seen crossing the street toward Berryhill and leaving on the motorcycle, Detective Mundy questioned defendant about Berryhill several days after her disappearance. Defendant admitted that he knew a Dawn that lived across the street from the liquor store on South Market Street and that he had also met her in the park a couple of times.

h. *The disappearance of Stark*

Stark also disappeared at the end of June 1987. Before her disappearance, Stark was staying with her friend, Lucy Gray, in Fall River Mills. Gray last saw Stark on June 24, 1987, two days after Gray's birthday. On Gray's birthday, Stark showed Gray a small chrome-colored gun that she carried in her purse.

Gary Evans, Stark's boyfriend, last saw Stark around June 25, 1987. At that time, Stark told Evans that she was going to Nevada City to appear in court two or three days later for a traffic violation. Stark never appeared for her court appearance in Nevada City, scheduled on June 29, 1987. Because

Stark anticipated that she might have to spend some time in jail and she had a "habit of coming and going," Evans did not become concerned when she failed to contact him. No one reported her disappearance to the police.

 i. *More Secret Witness calls, discovery of defendant as the Secret Witness caller, and discovery of remains of Stark and Berryhill*

On August 8, 1987, Landreth received a Secret Witness call from someone asking how much money he would receive for revealing the location of the body of a Gretchen Olsten. Landreth recognized the caller's voice as the same person who had made the 1985 telephone calls about Weeden and the 1986 call on an unrelated burglary. She related that she needed to contact the program's coordinator about a reward. Landreth then obtained authorization to offer a reward to the caller.

On August 17, 1987, the same person called several times. He told Landreth that Olsten's death had occurred about one and one-half months ago. He stated that if he gave directions to the body's location, he wanted to be paid that day without an autopsy confirmation of the person's identity. After Landreth and the caller agreed on a reward amount for an unidentified body, the caller gave specific directions to the body's location in a wooded area in Happy Valley. Landreth related this information to the sheriff's office. The caller called back that same day; Landreth said that the police could not locate the body. When she asked if there was a power line in the area, the caller replied that they were on the wrong road. The caller stated that when he picked up the reward money, he would leave information about the person responsible in an envelope. He volunteered that the "boyfriend was responsible."

Wanting to confirm her identification of the caller, Landreth taped "one or two sentences" during a telephone conversation. She played the tape for Detective Mundy over the telephone and played it again for him in person. Having spoken to defendant before, Detective Mundy identified defendant as the person on the tape.

As prearranged, Detective Francis Brewer of the sheriff's office left $500 reward money for the caller at the pickup point in the office of a title company in Redding. Detective Brewer was told that in exchange for the reward money, the caller would leave information on the identity of the killer. Defendant entered the office and gave the title company's director an

envelope in exchange for an envelope containing the reward money.[5] Brewer retrieved the envelope left by defendant and discovered it was empty. It was later determined that defendant's fingerprint was on the envelope.

Based on the information provided by the Secret Witness caller, on August 17, 1987, the police found scattered, decomposed human bones in the Happy Valley area, the same general area where Jacqueline H. had been raped. Although the caller had indicated that the body was that of "Olsten," the remains were later identified on October 16, 1987, as those of Stark.

The coroner could not determine the cause of death, but testified that photographs of the crime scene showed that Stark had been sexually assaulted and died an unnatural death. In examining the body, the coroner noted that the victim had suffered blunt trauma force to the upper jaw, which caused the dislodgement of one of her teeth. He opined that because of the severity of the injury and the lack of evidence that the body had responded to the injury, the injury had occurred at or near the time of death.

Sergeant Wooden discovered a blanket about 130 yards from where Stark's remains had been found. At trial, two women who had lived with defendant in 1985 identified the blanket. Although the blanket found was in worse condition, one woman viewed the blanket as identical, while the other woman thought that the blanket was similar to one they had seen in defendant's trailer.

After the discovery of Stark's unidentified body, Detectives Mundy and Newsome interviewed defendant about Berryhill's disappearance on August 26. Defendant theorized that Berryhill's boyfriend "killed her or whatever," but then later said he had "no idea" what had happened to her. He admitted that on the day he last saw Berryhill, he had taken her to buy marijuana, but she was unable to buy any because no one was home. He said that he had returned Berryhill, at noon, to her apartment where her mother was babysitting. Defendant denied that he took Berryhill anywhere that night and claimed that, instead, he had been on a date with a Leanne Thurman that night. Before his date, he was with his friend Dave Hancock at the home of Hancock's boss and told Hancock he wanted to be back home by 8:30 p.m. for his date.[6]

On September 15, 1987, Landreth received another telephone call from the person whom she recognized as the Weeden and "Olsten" caller. The

---

[5] At trial, the title company's director positively identified defendant as the person who had claimed the reward money that day.

[6] Hancock testified that during the summer of 1987, he and defendant were at his boss's ranch. After defendant announced that he was late for a date, he and Hancock returned to their home in Happy Valley. Several minutes later, when it was "almost dark," defendant drove off on his maroon Yamaha motorcycle. Sometime later, defendant revealed to Hancock that the

caller wanted reward money for information regarding the body of Berryhill. The next day, the same person called Landreth three times. During the course of these telephone conversations, Landreth offered $500 for the location of an "unidentified body." The caller replied that he had already divulged the body's identity the previous day. They finally agreed that if the caller's information led to Berryhill's body, he would receive $1,250, but that if it led to an unidentified body or the body was not Berryhill's, he would receive $500. The caller said that they would know it was Berryhill by her hair. When asked if Berryhill was no longer alive, he replied that he saw her boyfriend "do it to her." The Secret Witness program's advisory committee instructed Landreth to cooperate with law enforcement regarding any calls about Berryhill.

On the morning of September 22, 1987, the same caller telephoned Landreth five times. Detective Mundy monitored and taped two of the telephone conversations. During the course of the monitored conversations, Landreth lied and said that the call was not being recorded. She assured the caller that she could not recognize a person's voice since she talked to so many people every day. The caller described the area in Happy Valley where Berryhill's body was located and said that Berryhill had been strangled with a scarf. Mundy again recognized defendant's voice.

On September 22, 1987, based upon the information received from the caller, the police found a decomposed body in the Happy Valley area, about three-tenths of a mile from Stark's body and close to the area where Jacqueline H. had been raped. The body (later identified as Berryhill's) was under a mattress and surrounded by dense brush and pine needles that had fallen from overhead trees. It appeared that the mattress had been placed over the body some time after the body had been placed there. There were pine needles in between the body and mattress, but relatively few pine needles on top of the mattress. A scarf was wrapped around the body's neck. It was later determined that Berryhill died from strangulation. The police found a .22-caliber bullet slug near the victim's feet.

Later that day, after the body was found, Detective Mundy set up a surveillance at the title company office, the prearranged site where the caller would pick up the reward money. Detective Mundy saw defendant enter the office where defendant picked up the reward money. An officer took photographs of defendant entering and exiting the title company office. At trial, the title company's director positively identified defendant as the person who retrieved the reward money that day.

---

date was with Berryhill, but that she had already left with someone else before he got there. Although Hancock did not know anyone by the name of Dawn Berryhill, defendant further related that the police had spoken to defendant about her disappearance.

On September 23, 1987, the police found Berryhill's purse. The purse was unzipped and contained no money. Its contents, including documents with Berryhill's name, were scattered around the purse. It appeared that the purse had been there for awhile; the top of the purse and the scattered contents had been bleached by the sun.

On September 30, 1987, the police searched defendant's briefcase at his brother's house. Inside, they found a flat boot string that was no more than five feet in length. One end of the boot string was knotted, while the other end was pulled through the opening of the knot to form a sliding loop.

On October 5, 1987, Detectives Newsome and Mundy interviewed defendant again. They showed defendant the boot string from his briefcase and a photograph of him entering the title company office, and accused him of killing the three women. At one point, Detective Newsome agreed to fix $580 in traffic tickets for defendant if he gave them the name of Jane Doe One, the unidentified corpse that was later identified as Stark. Defendant admitted that he knew "all kinds of girls" who were missing, including Olsten, but denied that he killed anyone. When Newsome commented that defendant would need help if he had committed the murders, defendant asked to see a psychiatrist. A psychiatrist would confirm that he did not commit the murders.

On October 14, 1987, Landreth received two more telephone calls from the same Secret Witness caller. The caller was extremely upset that his anonymity had not been guaranteed and complained that the police had taken photographs of him picking up the Secret Witness reward money. He asked to meet with the Secret Witness coordinator to complain about the breach of the program's promise of anonymity to its callers. Landreth responded that she would try to reach the coordinator and asked him to call back.

The police asked Roy Del Carlo, a member of the Secret Witness's board of directors, to impersonate himself as the program's director and meet with defendant. Because the remains of the two people had not been identified yet, Del Carlo was asked to try and discover the identities of the bodies and the perpetrator. The caller called back and identified himself as Robert Maury. Landreth told defendant that she had arranged for him to meet with Del Carlo, the Secret Witness's coordinator, on the following day.

On the next day, defendant called Del Carlo. Identifying himself as Robert Maury, defendant suggested that they meet that same morning. During their meeting, defendant was extremely upset that the police had photographed him claiming the Secret Witness reward money and had seized some of his

personal items. He was also irate because the police had questioned his family members and had accused him of being homosexual; his family thought he was a murderer. Defendant demanded that unless the police apologized and returned his items, he would print and post 10,000 posters and place an advertisement in the paper discrediting the Secret Witness. When Del Carlo asked if he could provide additional information about Stark's still unidentified body, defendant replied that a purse containing identification could be found near the body. Defendant wanted a reward for this information; Del Carlo promised to pay defendant if the information proved to be accurate and the purse was found.

Later that day, defendant took Del Carlo to the purse. Defendant pointed to an object underneath some brush. When they got closer, Del Carlo saw that the object was a purse or handbag. When asked about additional evidence that would help the police, defendant replied that he could find a nickel-plated gun at that location. During the search for the gun, defendant became nervous when he heard a dirt bike and abandoned the search. On the ride back, defendant claimed that his girlfriend's brother told him about the bodies, that he took defendant to the bodies, and that they took money and evidence from some of the purses. Defendant offered to take Del Carlo to the brother to be arrested if the identification revealed that the purse belonged to somebody that defendant knew.

With the police, Del Carlo returned to and retrieved the purse, which was eight-tenths of a mile from Stark's body. The purse contained Stark's wallet, driver's license, and address book. Defendant's fingerprints were on pieces of paper inside the wallet. "Bob" had been written next to a telephone number on the back of the address book. "Nick" was also written in parentheses. The police later determined that defendant had given that same telephone number to others to contact him. The purse did not contain any money or a weapon.

On October 16, 1987, Del Carlo arranged to meet defendant to pay him $250 reward for the purse. Defendant said he would take Del Carlo to the gun. At the meeting, defendant again demanded an apology, and wanted his motorcycle back and some tickets fixed. He said that the Secret Witness had paid him $1,250 for the last body he had turned in. When Del Carlo asked how much it would cost to recover the gun, defendant replied that there would be no extra charge because it was part of the original deal. He was confident that the purse would identify Jane Doe One (Stark). He indicated that there were more bodies and evidence in the Happy Valley area and referred to another body that had been recovered with a rope or scarf tied around the neck.

On October 19, 1987, defendant spoke with Del Carlo on the telephone again. Defendant inquired if they could identify the victim from the identification in the purse; Del Carlo responded that he did not know. Defendant commented that he knew what the identification was, and it would identify the body. Defendant and Del Carlo met later that day. Defendant gave Del Carlo two traffic tickets to fix and showed him some anti-Secret Witness fliers that he intended to post.

On October 20, 1987, defendant called Del Carlo. He said that because he had received his motorcycle back, he would not post the fliers. Defendant agreed to sign a document releasing the Secret Witness from liability for having divulged his identity as the caller.

On October 21, 1987, defendant met Del Carlo and signed the release. Because the police could not locate a gun, Del Carlo inquired about it again. Defendant assured him that the gun was "out there" and that it was nickel-plated. He related that he would try to get a better location on the gun from his girlfriend's brother, and would take him there so that he would leave his footprints and the police could catch him. Defendant denied that he knew Stark. The police never found a gun near Stark's body.

At defendant's suggestion, Detective Newsome arranged for Dr. Angela Curiale, a psychologist, to meet defendant on October 23 and 30, 1987. In between these two interviews, on October 26, Newsome spoke with defendant on the telephone and asked him about the cause of Stark's death. Defendant replied that Newsome already knew it. When Newsome guessed that she was strangled, defendant responded, "That's what I heard." During this conversation, defendant said that he would tell Dr. Curiale what he knew about Stark's death, and where he had been told the murder weapon was located. Detective Newsome then met with defendant in person after defendant demanded that the police return his property taken from his brother's house. During this meeting, defendant further represented that he would give up Stark's murder weapon when he met Dr. Curiale on October 30.

During the interviews with Dr. Curiale, defendant claimed he did not know the cause of Stark's death. At the end of the October 30, 1987 session, Dr. Curiale saw defendant pull out what appeared to be a flat boot string from his pocket and quickly put it back. He commented that she should have searched his jacket while she had the chance; it would have given her some insight into who he was.

j. *Defendant's arrest and subsequent events*

On November 6, 1987, the police arrested defendant. They searched defendant's residence and found a Yamaha motorcycle and a Honda motorcycle.

On November 7, 1987, Sandra Morton saw a newspaper article about defendant's arrest, which contained photographs of Stark and defendant. Morton, a bartender, recalled that defendant, Stark, and Evans had been in her bar in the Fall River Mills Hotel toward the end of June 1987. At the time, defendant was sitting alone with his chair leaning back against the wall and staring toward Stark. Morton noticed defendant because he had a "strange face" and was sitting alone in a generally friendly atmosphere. Morton called the sheriff's office and positively identified defendant's photograph from a photographic lineup as the person she had seen in the bar staring at Stark. At trial, she also positively identified defendant as the person she had seen in the bar.

Patricia Huff and Evelyn Snipes also recognized defendant's photograph in the newspaper. Huff recalled that she had seen defendant and Stark talking with each other in a liquor store one afternoon in late June or early July of 1987. Later that evening, she saw Stark and Evans together in the Fall River Mills Hotel bar, while defendant was seated by himself and staring in the direction of Stark. Snipes, a clerk at a market in Fall River Mills, recalled that she had seen defendant and Stark together at the market two or three times during the summer of 1987.

At defendant's request, Detective Newsome met with defendant at the county jail on November 18, 1987. When Detective Newsome advised defendant of his Miranda rights, defendant said he wanted to talk, but only hypothetically, and insisted that the conversation not be taped. After they signed an agreement that defendant wrote to that effect, defendant discussed how he was going to "beat" each criminal charge. Defendant claimed that Nick Pinada was a possible suspect and offered that if the prosecution granted him immunity on two or three of the cases, he would testify against Pinada regarding the murders of Stark and Berryhill. He related that Pinada knew Stark and had killed more than one person.[7]

On January 28, 1988, the day after the preliminary hearing in this case was held, a newspaper reporter interviewed defendant in county jail. During the interview, defendant claimed that he had not been in Fall River Mills since 1977 and that he had never seen Stark "in his life." When asked about his fingerprints that were found inside Stark's purse, defendant admitted that he had opened her purse. When asked about his fingerprints found on the

---

[7]The defense claimed that the writing "Nick" on the back of Stark's address book was a reference to Nick Pinada, who was married to Cheryl Stapley. Before their marriage, defendant had lived with Stapley during the first three months of 1987. The telephone number on the back of Stark's book was Stapley's telephone number. Pinada testified that he had never met anyone named Belinda Jo Stark.

envelope that was left at the Secret Witness drop-off location, defendant said he did not know how they got on the envelope, but conceded that they were his fingerprints. Defendant claimed that "the real killer," an acquaintance of his, told him the location of the two women's bodies found in the Happy Valley area and that he had killed them. He also claimed that Morris had used "a rope or something" to strangle Weeden.

### k. *Other admissions made by defendant*

At trial, several witnesses testified regarding incriminating statements made by defendant. Norma Schwartz testified that on August 23, 1985, she worked with defendant in a restaurant and had an argument with him. He then threatened, "Listen bitch, I have killed before. And you'll [be] just one more. And I'm going to snuff you out." Schwartz became frightened and reported the threat to her manager.

Beth Von Millanich (defendant's former girlfriend) testified that sometime in 1985, defendant related that his landlord had been murdered, that he was a suspect, and that he was excited that he was a suspect. Defendant appeared happy about his status as a suspect.

In the summer or fall of 1986, defendant was in county jail on an unrelated matter. As a jail trusty, defendant delivered towels to other inmates in their cells. Defendant told Tracy Trantham, one of the inmates, that he knew who had killed Weeden and that she was a "snitch" and "any snitch deserved to die." Several times, he said that he fantasized about "strangulation with sexual relations." Once, he asked Trantham if she had ever killed anyone. When she replied no, he related that he had. Defendant also told Trantham that he hated women and that "they had done a lot of things to burn him."

In February and March 1987, defendant had a sexual relationship with Stapley, who lived next door to him in Happy Valley. While having sex together, defendant said that "they" had killed the landlady and that he had been brought in for questioning on it. He laughed that he had "got off of that" and bragged that the police could not "get him for nothing" and that he "can get off of anything." Defendant made her promise not to tell anyone about the landlady. At the time, Stapley thought defendant was lying because she had neither heard nor read anything about a landlady being murdered.

In the summer or fall of 1987, defendant and Shelley Sly were at a bar while the movie Platoon was playing. Defendant told Sly that when he was in Vietnam he had to kill lots of men and women. He related that he had to strangle one and she died.

### 2. *The Defense's Case*

The primary theory of the defense at trial was that the prosecution had not proven its case against defendant. Regarding the Weeden murder charge, the defense relied on defendant's extrajudicial statements to Detective Mundy and District Attorney Carlton that Morris killed Weeden and forced defendant to strike her with a rock after she was already dead. To support that defense, defendant presented evidence that Weeden had bought drugs with counterfeit money, that Morris had been involved with her in buying drugs, that he possessed Weeden's truck after her disappearance, that he disassembled the truck and sold its parts, and that he had been subpoenaed as a witness in defendant's trial but disappeared before trial. The defense theorized that Morris strangled Weeden over drugs and that he stole her truck after the killing. Defendant disputed that he made the 1985 Secret Witness calls regarding Weeden. He attempted to impeach Landreth's voice identification by establishing that her answering service took in 2,000 calls per day and that one month before the preliminary hearing, she received a telephone call and could not identify whether the caller was defendant, his brother, or someone else.

Regarding the Jacqueline H. rape charge, defendant attempted to impeach Jacqueline H. by presenting evidence that she had prior convictions and current charges for theft-related offenses, that she was addicted to methamphetamine, and that she had failed to seek medical attention or report the alleged rape until over one month afterwards. A defense psychologist testified that acute paranoia may be caused by heavy use of methamphetamine.

Regarding the Berryhill and Stark charges, the defense theory was that defendant discovered the bodies accidentally while taking routine walks in the Happy Valley area and that he made the Secret Witness calls to obtain reward money, consistent with his history of helping the police as a paid informant. To support his theory that Berryhill's boyfriend, Brumett, killed Berryhill, defendant presented evidence that Brumett was angry at Berryhill for throwing him out of the apartment, that he had threatened to kill Berryhill, and that he was waiting for Berryhill outside her apartment on the night of her disappearance. Defendant also attempted to impeach Koeller's identification of him as the last person seen with Berryhill by presenting evidence that Koeller could not identify defendant in a photographic lineup soon after Berryhill's disappearance and that a witness might have seen Berryhill on the following day.[8]

To support his defense that the prosecution failed to prove how or when Stark died and that her death resulted from a homicide, defendant presented

---

[8]On rebuttal, Koeller explained that he did not identify defendant's photograph because he did not want to be a snitch.

testimony that several witnesses estimated they may have seen Stark in early July and that Stark had suffered a facial injury in a car accident before her disappearance. He denied that he knew Stark and attacked the reliability of the identifications of his presence with Stark.

B. *The Penalty Phase*

1. *The Prosecution's Case*

In addition to relying on the circumstances of the charged offenses, the prosecution introduced evidence of defendant's two prior felony convictions for receiving stolen property.

2. *The Defense's Case*

The defense presented evidence relating to defendant's mental condition, marijuana abuse, and family background, including the mental and physical abuse inflicted on him and his siblings by his alcoholic father. In addition, defendant read a statement to the jury in which he claimed he had a "normal childhood," denied that he suffered from depression, and declared, "You found me guilty of three murders, one rape, one attempted rape and one robbery. It's totally unrealistic for you to give me life in prison without parole. If you think I'm guilty, you give me the death penalty."

II. DISCUSSION

A. *Jury Selection Issues*

Defendant contends that the trial court erred in granting several of the prosecutor's challenges for cause and in denying two of his challenges for cause. ■ Whether the contention is that the trial court erred in excluding prospective jurors who exhibited an anti-death-bias, or erred in failing to exclude prospective jurors who exhibited a pro-death-bias, the same standard applies. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1318 [65 Cal.Rptr.2d 145, 939 P.2d 259].) "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519], quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) "On review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding. If there is no inconsistency, the reviewing

court will uphold the court's ruling if substantial evidence supports it." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

### 1. *Grant of Prosecutorial Challenges*

█ The prosecutor challenged nine prospective jurors for cause. The trial court granted eight of those challenges. Defendant now claims that the court erred in granting six of the eight challenges for cause. As will appear, because the challenged prospective jurors indicated either that they could not apply the death penalty under any circumstance, or were not prepared to impose the death penalty and were undecided as to their ability to do so, the trial court did not err in excusing them. (*People v. Cunningham, supra,* 25 Cal.4th at pp. 980-982.) Moreover, at the most, the potential jurors' statements were equivocal and conflicting regarding their ability to render a death verdict. Thus, we must defer to the trial court's determination of their states of mind.

### a. *Prospective Juror Fred R.*

In his questionnaire and in response to the trial court's questions, Prospective Juror Fred R. stated that he might have problems applying the law to the case because he has opposed the death penalty as an appropriate punishment for "most of [his] adult life." Further voir dire revealed the extent of Fred R.'s opposition against the death penalty: he stated that society's imposition of capital punishment was "in a sense committing murder" and that he could not participate in a procedure that imposes the death penalty on a person. On the other hand, he related that there was an "extremely remote" possibility that he could impose a death verdict, but that the decision would be an emotional one, rather than one based on his "own reasoned conscience." (See *People v. Cunningham, supra,* 25 Cal.4th at pp. 980-981 [prospective juror who could apply death penalty only if victim was family member was properly excused].)

Exploring this discrepancy, defense counsel asked Fred R. which factor weighed more heavily, the prospective juror's desire to comply with the law or his personal feelings about capital punishment. Fred R. replied, "That's very difficult because I don't believe in the law in this particular case." He could conceive of a situation that would cause him to follow the law as instructed and impose the death penalty, but "it would be a surprise." During questioning by the prosecutor, Fred R. reaffirmed his belief that capital punishment was "society's version of murder," but stated that as a juror, he would have to take part in that process. To further clarify Fred R.'s views,

both the prosecutor and defense counsel asked him whether he could sign a verdict form imposing death if he was the foreman. Fred R. said he could not. Upon realizing that he would be required "to take complete responsibility" for something that he could not justify, Fred R. stated that he did not feel qualified within the law to sit as a juror in this case. He explained that his initial opinion that he could be seated as a juror in a capital case, although difficult, had been modified to the belief that he would *not* be qualified to sit as a juror. Juror Fred R. was properly excused. (See *People v. Cunningham, supra,* 25 Cal.4th at p. 980 [prospective juror properly excused for cause when he stated that he could not look at defendant and inform him that he had decided defendant should die, and that he did not want to go through such proceedings].)

b. *Prospective Juror Wyonne W.*

Prospective Juror Wyonne W. stated that she could follow the law and maintain an open mind and be willing to listen impartially to the evidence at the penalty phase. However, she later expressed doubts of her ability to "be a part of putting somebody to death, even if that person was a part of many deaths." When asked if she could entertain the idea of putting defendant to death after determining that he was guilty of three murders and listening to more evidence, Wyonne W. replied, "I don't think so." Juror Wyonne W. was properly excused.

c. *Prospective Juror Curtis B.*

Prospective Juror Curtis B. expressed uncertainty as to whether he could apply the law and impose the death penalty. His uncertainties appeared to stem from the fact that his wife and friends knew defendant and he feared that he would "have to answer" in his afterlife for a decision that would hurt someone else. When asked by defense counsel if he could impose the death penalty if, after rendering a guilt verdict and considering the evidence at the penalty phase, he concluded that it was warranted and the appropriate punishment, Curtis B. replied that he could not promise that. Juror Curtis B. was properly excused. (Cf. *People v. Ochoa* (1998) 19 Cal.4th 353, 428 [79 Cal.Rptr.2d 408, 966 P.2d 442] [voir dire question whether prospective juror could promise to vote for death if she felt that death was the appropriate verdict properly sought a commitment from her to perform her duty].)

d. *Prospective Juror Joe T.*

When asked if he could vote for the death penalty "no matter what the circumstances were," Prospective Juror Joe T. replied, "I don't believe so.

I'm not certain." After further questioning, he stated that he could not envision any situation, as a juror, in which he could impose the death penalty. Juror Joe T. was properly excused.

### e. *Prospective Juror Lori D.*

Expressing some uncertainty as to whether she could impose the death penalty, Prospective Juror Lori D. stated that she had taken an anti-death-penalty stance in recent years, that she did not think it was right to impose the death penalty, and that it could be "morally" wrong. Defense counsel asked if she would be able to vote for death if, after listening to all the evidence, she determined that the aggravating circumstances were so substantial in comparison to the mitigating circumstances that it warranted death. Lori D. replied, "I don't think so." She was properly excused. (*People v. Cunningham, supra,* 25 Cal.4th at p. 981 [prospective juror properly excused because she could not personally impose death penalty despite viewing it as an appropriate punishment].)

### f. *Prospective Juror Joe H.*

When initially asked if he had strong feelings about the death penalty, Prospective Juror Joe H. responded that since he had never been asked about that subject, he could not say. Although Joe H. once agreed that he could impose verdicts of death or life without the possibility of parole, he later equivocated and said that he did not know if he could impose either penalty. Upon further questioning, Joe H. stated that he could not vote to impose the death penalty. He explained that he had never had to think about the subject, but that, upon reflection, he could not impose death. Juror Joe H. was properly excused.

### 2. *Denial of Defense Challenges*

Defendant challenged Jurors Scott S. and Curtis L. for their alleged pro-death-penalty bias. Defendant faults the trial court for denying those challenges for cause. Here, the record shows that defendant accepted the jury after having exercised 23 of the 26 peremptory challenges allotted to him. To preserve a claim based on the trial court's overruling a defense challenge for cause, a defendant must show (1) he used an available peremptory challenge to remove the juror in question; (2) he exhausted all of his peremptory challenges or can justify the failure to do so; and (3) he expressed dissatisfaction with the jury ultimately selected. (*People v. Cunningham, supra,* 25 Cal.4th at p. 976; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Defendant failed to satisfy any

of these requirements. Therefore, his claim of error is not preserved for appeal. (*People v. Lewis* (2001) 25 Cal.4th 610, 634 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

Nevertheless, defendant asserts that his claim is preserved because he was justified in failing to use his available peremptory challenges to excuse the two jurors. He argues that given the large number of prospective jurors who had been exposed to pretrial publicity, it was likely that Scott S. and Curtis L., who had not been so exposed, would have been replaced with two jurors who were prejudiced by the pretrial publicity. However, defendant fails to give any record support for that claim. Moreover, defense counsel expressed no dissatisfaction with the jury. Thus, his argument is simply speculative. (See *People v. Crittenden, supra,* 9 Cal.4th at p. 121 [if defendant claims that the trial court wrongly denied challenge for cause, he must *demonstrate* that the right to fair and impartial jury thereby was affected].)

Even if the issue were cognizable, defendant would not prevail. As shown below, defendant ultimately passed for cause one of the jurors he now contests. The other juror's statements were, at most, conflicting. Accordingly, we must defer to the trial court's determination of his state of mind.

### a. *Juror Scott S.*

When asked by defense counsel to assume that defendant was found to have committed three deliberate and premeditated murders, and a rape and robbery without justification, Scott S. replied that the death penalty would be appropriate. However, he also said that he could keep an open mind regarding penalty. After questioning Scott S., defense counsel challenged him for cause. The record reflects that the trial court did not rule on the challenge at that time, but asked the prosecutor if he had any questions of Scott S. Apparently sensing that Scott S. was confused regarding the trial process, the prosecutor reviewed the guilt and penalty phases in more detail. He explained that the law required that the jurors be "neutral" on penalty at the start of the penalty phase and make their determination based on the evidence, including circumstances of the crime and defendant's background, presented at the penalty phase. After the explanation, Scott S. stated that he "probably could keep an open mind" at the penalty phase.

After the trial court noted the inconsistent answers given to defense counsel and the prosecutor, Scott S. assured the court that he could keep an open mind on the penalty regardless of the findings made at the guilt phase. When defense counsel asked why his opinion had changed as to the appropriateness of the death penalty, Scott S. explained that when he initially

responded, he did not know that defendant's background was a relevant factor at the penalty phase. He assured defense counsel that even if he found defendant guilty of three murders, a robbery, and a rape, he could remain "completely neutral" regarding penalty. After the second round of questioning, defense counsel passed Scott S. for cause. Thus, it appears that after further questioning of Scott S., defense counsel changed his mind about Scott S.'s ability to remain fair. Under these circumstances, defendant cannot now complain of the trial court's failure to grant his challenge of Scott S. for cause. (*People v. King* (1970) 1 Cal.3d 791, 804 [83 Cal.Rptr. 401, 463 P.2d 753] [any challenge for cause must be seasonably made or is waived].)

b. *Juror Curtis L.*

When asked by defense counsel whether he could consider imposing either death or life without parole if he concluded that defendant committed three premeditated and deliberate murders without justification, Curtis L. indicated twice that the decision would be hard, but that he would probably lean in favor of the death penalty. In addition, when asked if he could assure the parties that he would keep an open mind regarding punishment if he were convinced beyond a reasonable doubt that defendant committed "three heinous, premeditated, deliberate killings," Curtis L. responded, "No, I couldn't." Later, the juror qualified those answers by emphasizing repeatedly that he believed he was an open-minded person and could remain so, that the appropriate punishment would depend on the circumstances, the defendant's state of mind at the time of the crime, and the evidence presented, and that he would follow the instructions. Moreover, Curtis L. stated that he was not opposed to the death penalty, but that he believed it should not be imposed "lightly" and without "much thought and soul searching." The trial court denied defendant's challenge for cause because Curtis L. stated he could keep an open mind and follow the instructions. We find that the trial court's retention of Curtis L. is amply supported by the record.

B. *Pretrial Issues*

1. *Suppression Motion*

Defendant claims that the trial court erred in failing to grant his motion to suppress evidence pursuant to section 1538.5. He argues that the trial court should have suppressed all evidence of his Secret Witness telephone calls to Landreth relating to the three murder victims, including the content of those conversations, and all evidence resulting from the Secret

Witness calls, including evidence of his identity as the caller. We find no error.

Defendant moved to suppress all evidence of the 1985 Secret Witness telephone calls regarding Weeden and the 1987 Secret Witness telephone calls regarding Berryhill and Olsten/Stark, including evidence of defendant's identity as the Secret Witness callers. In alleging a Fourth Amendment violation, defendant relied on representations that the Secret Witness program guaranteed anonymity to its callers. He argued that the police violated that guarantee of anonymity when they illegally taped his telephone conversations with Landreth without a search warrant, and illegally took photographs of and surveilled defendant at the title company drop-off point for the purpose of establishing his identity as the Secret Witness caller.

The following uncontradicted evidence was presented at the suppression hearing: The Secret Witness program of Shasta County was established by the Soroptimists, a private service organization, to aid law enforcement in investigating crimes. The program allows citizens to report information on crimes, with the possibility of receiving a reward. The program's advisory board consists of private citizens and representatives from various law enforcement agencies. Based on recommendations by various law enforcement agencies, the board decides the reward offers to be made in specific criminal cases and the proposed payoffs for information provided. The listed crimes and approved reward offers are publicized in the newspapers and on television and radio. The board has the authority to deny requests for cooperation from law enforcement. Landreth, the owner of an answering service, contracted with the Secret Witness program to receive calls and information from tipsters, assigned tipsters a code number for identification purposes, and relayed information to the appropriate law enforcement agency. Funding for the program was not provided by law enforcement, but by various service organizations.

The police began recording the telephone calls between defendant and Landreth on September 21, 1987. Before that time, none of the calls between the Secret Witness caller and Landreth had been recorded or monitored by the police. However, the police decided to solicit the help of the Secret Witness program and monitor the telephone calls after they began to suspect that defendant was the Secret Witness caller on the August 1987 Olsten/Stark calls and on the September 1987 Berryhill calls.

On August 8, 1987, Landreth received an inquiry about the reward money for the location of Olsten's body and recognized the caller's voice as the same person who had made the 1985 Weeden calls. She recorded one of the

telephone calls on August 17 and played it for Detective Mundy to see if he could identify the voice independently. He too recognized the voice and believed that defendant was the caller.

On September 15, 1987, Landreth received a new inquiry about the reward money for the location of Berryhill's body and again recognized the caller's voice as the same person who had made the 1985 Weeden calls and the August 1987 Olsten/Stark calls. In addition, the caller referenced distances in terms of meters. Landreth contacted Detective Brewer of the sheriff's office regarding the caller's request for reward money in exchange for information on the location of the Berryhill body.

On September 17, 1987, the Secret Witness board authorized payment of the reward money. Also, in response to the request by Detective Brewer, the board authorized Landreth to cooperate with law enforcement in the homicide investigations, including monitoring and recording the Secret Witness calls relating to Olsten/Stark, Berryhill, and Weeden and help in arranging the surveillance of defendant. Detective Brewer informed the board that the police suspected defendant had been the Secret Witness caller on all three homicide cases and, based on the known circumstances, considered him a suspect in at least one, if not all, of those homicides. They also believed defendant was using the Secret Witness program for financial gain in committing the criminal acts. To determine the identity of the Secret Witness caller, the police then taped subsequent Secret Witness calls and had Landreth arrange for defendant to pick up the reward money at a prearranged drop-off point on September 22. The police took photographs of defendant entering and exiting the drop-off point.

The media has reported that the Secret Witness program assures anonymity to its witness callers. Also, when a tipster makes a call to Landreth, she relates that the caller's identity will remain confidential, but that the information will be used by law enforcement. The reason the Secret Witness program guarantees anonymity is to provide a means for reluctant witnesses to provide information on crimes to the police. The Secret Witness board members, including those from various law enforcement agencies, agreed that the program guarantees anonymity only to witnesses, and not to criminals or tipsters who the police suspect are providing information on their own crimes. To guarantee anonymity to such a criminal would be contrary to the purpose of the Secret Witness program, i.e., to solve crimes. The coordinator of the Secret Witness program testified that although the program guarantees anonymity to a Secret Witness caller, a caller's identity remains confidential only as long as the caller keeps it a secret.

The trial court denied defendant's suppression motion on the grounds that (1) no caller to the Secret Witness program could have had a reasonable

expectation that the information divulged, or the caller's identity, would remain confidential if that information led the police to suspect the caller was the actual perpetrator, and (2) defendant waived any expectation of privacy as to his identity when he revealed his name during the 1986 call. The Attorney General argues that we need not decide the waiver issue because defendant's claimed subjective expectation of privacy was objectively unreasonable. We agree.

■ "The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

■ The Fourth Amendment protects against unreasonable searches and seizures. (*Katz v. United States* (1967) 389 U.S. 347, 353 [88 S.Ct. 507, 512, 19 L.Ed.2d 576].) Its purpose is to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (*Camara v. Municipal Court* (1967) 387 U.S. 523, 528 [87 S.Ct. 1727, 1730, 18 L.Ed.2d 930].) "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " (*California v. Ciraolo* (1986) 476 U.S. 207, 211 [106 S.Ct. 1809, 1811, 90 L.Ed.2d 210].) The analysis consists of a two-part inquiry: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" (*Ibid.*) "Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." (*Katz, supra,* 389 U.S. at p. 361 [88 S.Ct. at p. 516] (conc. opn. of Harlan, J.).) "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." (*Id.* at p. 351 [88 S.Ct. at p. 511].) Accordingly, the Fourth Amendment only protects against those government intrusions without warrant or probable cause that violate reasonable expectations of privacy. (*Oliver v. United States* (1984) 466 U.S. 170, 177-178 [104 S.Ct. 1735, 1740-1741, 80 L.Ed.2d 214].)

■ In arguing that the content of all his conversations with Landreth, as well as his identity as the caller, should have been suppressed, defendant

does not distinguish between the pre-September 21, 1987, conversations that were not taped and the conversations that were taped, on and after that date. Regarding the untaped conversations, we perceive *no* governmental intrusion. Defendant called the Secret Witness program and provided Landreth all of the information *voluntarily*.[9] Regarding the taped conversations, the police intrusion or surveillance was lawful: they monitored the telephone calls because they suspected that defendant was the Secret Witness caller and the killer of all three victims. (§ 633.5.)[10] Moreover, any expectation that the police would not monitor a telephone call *voluntarily* initiated by defendant to the Secret Witness program, presumably a law enforcement agent, is simply not an expectation that is objectively reasonable, warranting Fourth Amendment protection. Similarly, the police surveillance and photographing of defendant entering and exiting the drop-off point is not a subject of Fourth Amendment protection since defendant knowingly exposed his whereabouts in public.

By not differentiating between the unrecorded and unmonitored telephone calls and the recorded and monitored ones, it appears that defendant is really arguing that Secret Witness program's promise of anonymity and its *breach* by law enforcement violated his reasonable expectation of privacy and is therefore a search proscribed by the Fourth Amendment. We reject that argument for a number of reasons.

First, we fail to see how this alleged breach of a promise of anonymity rises to a Fourth Amendment violation, i.e., a governmental *intrusion* or interference that infringes upon a reasonable expectation of privacy as to the challenged search.

Second, defendant's claim that the Secret Witness program promised "complete anonymity" to all tipsters, including callers providing tips about crimes they have committed or are suspected of committing, is not supported by the record. Indeed, the trial court impliedly found otherwise. In its denial order, the trial court stated: "No caller to a secret witness program could have a reasonable expectation that the information he divulged would remain

---

[9]At the suppression hearing, defendant argued that the Secret Witness program acted as an agent of law enforcement. For purposes of Fourth Amendment analysis, the trial court adopted that assumption.

[10]Section 633.5 provides, in pertinent part: "Nothing in Section 631, 632, 632.5, 632.6, or 632.7 prohibits one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of . . . any felony involving violence against the person . . . . Nothing in Section 631, 632, 632.5, 632.6, or 632.7 renders any evidence so obtained inadmissible in a prosecution for : . . any felony involving violence against the person, . . . or any crime in connection therewith."

confidential. The term confidential communication as defined in [Penal] Code Section 632, [subdivision] (c) includes only those communications carried on in circumstances that would reasonably indicate that any party to the communication desired it to be confined to the parties thereto. The obvious primary and publicized purpose of the secret witness program is to gather information helpful to law enforcement in apprehending and convicting persons responsible for criminal acts. The 1985 and 1989 newspaper clippings submitted in evidence as defendant's 'M-1' and 'M-2' provide, just prior to the guarantee of anonymity, that 'information provided will be used by police and sheriffs' investigators to gather evidence.' Any reasonable caller would know that the information provided would be passed on to law enforcement.

"[I]n the view of this Court, under present Federal Law, society is not prepared to recognize as reasonable or justifiable any expectation of anonymity by a caller to an anonymous witness program, such as Secret Witness, under circumstances in which the information the caller divulges reasonably gives law enforcement probable cause to believe that the caller may be the perpetrator of a serious crime to which the information relates. The primary purpose of such anonymous witness programs is the apprehension and conviction of criminals. The promise of anonymity is offered only for the purpose of inducing reluctant informers to provide information which assists in this primary purpose. The inducement derives from the protection from publicity or retaliation that the informer receives by remaining anonymous. People v. Callen [(1987)] 194 [Cal.App.]3d [558,] 563, [239 Cal.Rptr. 584] partially quoted by defendant in brief, also stresses that 'It is the promise of anonymity which allays the fear of criminal retaliation which otherwise discourages citizen involvement in reporting crime.'

"Any reasonable voluntary provider of information to such a program must know that such information will be used to identify and apprehend the criminal perpetrator. If that information logically leads to an investigation of the caller as a suspected perpetrator, the reason for the promise of anonymity disappears, and the promise can no longer justifiably be relied upon by the caller, certainly not to the extent of evidence exclusion under the Fourth Amendment of the Constitution."

Although the trial court couched the expectation of privacy analysis in constitutional terms, it appears that the trial court was also making findings of fact. By finding that no reasonable person would believe that a *suspect's* identity would remain anonymous simply because he or she provided information, the trial court impliedly found that the Secret Witness program did not, in fact, guarantee anonymity under all circumstances. The evidence supports that implied finding of fact. A flier publicizing the program stated:

"Are you a witness to a crime . . . but afraid to tell anyone? Then 'Secret Witness' is for you. Are you a concerned citizen? Do you have knowledge of a crime? Are you afraid that if you tell, you'll be in danger? . . .

"If you have any information on a crime, the Secret Witness Program has a telephone answering service you can call or a post office box you can write. You can remain anonymous and not give your name.

"If a Secret Witness reward has been posted for a certain crime that needs to be solved and the information you reported leads to the arrest and conviction of the individual responsible, the Secret Witness Program will pay you an award.

"And . . .

"You will remain unknown. This is Guaranteed! . . .

"You will not be involved.—The authorities will develop their own evidence from your information. . . ."

Thus, the flier assures anonymity to those witnesses who fear retaliation if they come forward with information, and states that an award will be paid if the reported information leads to the arrest and conviction of the individual responsible. When the stated purpose of anonymity (protection of fearful witnesses) and the intended purpose for the information (arrest and conviction of perpetrators) are considered together, the flier cannot reasonably be understood to assure readers that a criminal, by providing information on a crime, would be shielded from prosecution and conviction for that same crime. Moreover, the uncontradicted testimony at the suppression hearing reflects that the people associated with the Secret Witness program understood that the program only guarantees anonymity to witnesses, and not criminals or tipsters who the police suspect are providing information about their own criminal activities. Accordingly, we also reject defendant's claim that he did not voluntarily consent to the "search and seizure," i.e., the acquisition and use, of his Secret Witness statements, because they were obtained by fraud, subterfuge, and trickery.

Finally, we reject defendant's Fifth Amendment and due process claim. He argues that his Secret Witness statements to Landreth, including his admission or confession to Landreth that "Bob" had killed Weeden, were involuntary because they were improperly induced by promises of anonymity and rewards.

At trial, defendant failed to object to admission of his statements and raise the involuntariness claim on the constitutional grounds he now asserts. Thus,

he has forfeited his claim on appeal. (*People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846] [a claim of involuntariness generally will not be addressed for the first time on appeal]; *People v. Mayfield* (1993) 5 Cal.4th 142, 172 [19 Cal.Rptr.2d 836, 852 P.2d 331] [same].)

Defendant argues that his trial counsel's failure to preserve his current challenge to his Secret Witness statements amounts to ineffective assistance of counsel. We disagree. For the reasons stated above, defendant's claim that he was induced by promises of complete anonymity is unfounded. Moreover, the Secret Witness program's offers of rewards and anonymity were not coercive, and a suppression motion could not have been properly granted on this ground. Coercive activity by the state is a necessary predicate to the finding that a confession or admission is not voluntary. (*Colorado v. Connelly* (1986) 479 U.S. 157, 163 [107 S.Ct. 515, 519-520, 93 L.Ed.2d 473]; *People v. Clark* (1993) 5 Cal.4th 950, 989, fn. 14 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) Here, defendant initiated and instigated the negotiations for a reward, which had been generally offered to the public, in return for information about the missing victims. Defendant named his own terms in exchange for his statements, decided for himself with whom he would negotiate, and solicited and received the reward he wanted as a consideration for telling what he knew. Thus, defendant's desire to provide information to obtain a reward was entirely self-motivated. (See, e.g., *People v. Steger* (1976) 16 Cal.3d 539, 550 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People v. Barker* (1986) 182 Cal.App.3d 921, 933 [227 Cal.Rptr. 578]; *People v. Andersen* (1980) 101 Cal.App.3d 563, 582 [161 Cal.Rptr. 707]; see also *Hunter v. Swenson* (W.D.Mo. 1974) 372 F.Supp. 287, 301-302.) Under such circumstances, defendant's statements were clearly voluntary.

### 2. *Alleged Incompetence of Counsel—Failure to Renew Change of Venue Motion*

Defendant claims that his trial counsel was ineffective for failing to renew a motion for change of venue after jury voir dire. On June 28, 1988, before voir dire, defendant filed a motion for a change of venue. After an evidentiary hearing, the trial court denied the motion without prejudice to renewal during jury selection. Following the denial, defendant petitioned for a writ of mandate, which was summarily denied by the Court of Appeal. Defendant filed a petition for review in this court (*Maury v. Superior Court,* Jan. 17, 1989, S008628), which was also summarily denied on March 2, 1989. A jury was then selected on June 9, 1989. Defendant did not renew the motion for change of venue after selection of the jury.

"[W]hen a trial court initially denies a change of venue motion without prejudice, a defendant must renew the motion after voir dire of the

jury to preserve the issue for appeal. Here, although expressly invited by the court to renew the motion after jury selection, defendant failed to do so." (*People v. Williams* (1997) 16 Cal.4th 635, 654-655 [66 Cal.Rptr.2d 573, 941 P.2d 752]; see also *People v. Hart* (1999) 20 Cal.4th 546, 598 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Bolin* (1998) 18 Cal.4th 297, 312 [75 Cal.Rptr.2d 412, 956 P.2d 374].) ▮ Recognizing the procedural default, defendant claims that his counsel was incompetent for failing to renew the motion after jury voir dire. The record fails to reveal any incompetence.

▮ Defendant has the burden of proving ineffective assistance of counsel. (*People v. Malone* (1988) 47 Cal.3d 1, 33 [252 Cal.Rptr. 525, 762 P.2d 1249].) To prevail on a claim of ineffective assistance of counsel, a defendant " 'must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice.' " (*People v. Hart, supra,* 20 Cal.4th at p. 623.) A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 2065, 80 L.Ed.2d 674].) Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. (*Id.* at p. 690 [104 S.Ct. at pp. 2065-2066].) To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Moreover, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* 466 U.S. at p. 694 [104 S.Ct. at p. 2068].)

▮ In passing on a motion for change of venue, the trial court looks to the following factors, among others: the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and the nature and extent of the publicity. (*People v. Sanders* (1995) 11 Cal.4th 475, 505 [46 Cal.Rptr.2d 751, 905 P.2d 420].) ▮ Defendant argues that because there was a reasonable likelihood that he could not receive a fair and impartial trial in Shasta County, defense counsel should have renewed the motion for change of venue. Reiterating many of the same arguments that had been presented to the trial court on the initial motion for change of venue, defendant points to the gravity and nature of the crimes, the small size of the community, and the extensive media coverage, including newspaper articles and television and radio broadcasts.

At the evidentiary hearing, the trial court heard the testimony of two defense experts who had reviewed the publicity about the case and conducted a public opinion survey in Shasta County. According to the survey's results, 90 percent of those surveyed recognized defendant's case. Of those who had heard of the case, 54 percent believed that defendant was guilty. One of the defense experts opined that, at the time of the evidentiary hearing, there was a reasonable likelihood that defendant would not get a fair trial in Shasta County. The prosecution's expert attacked the survey's validity and accuracy. In denying the motion for change of venue, the trial court found that the survey's results were inaccurate and biased and that the expert's opinion regarding the unlikelihood of a fair trial was also entitled to little weight. The court also found that there would be at least a year between the occurrence of most of the publicity and the start of trial, the publicity about the case was "neither slanted against the defendant nor reflect[ed] a spirit of revenge in the community," and the victims and the defendant were not prominent members of the community.

Defendant does not claim that defense counsel was incompetent in presenting the initial change of venue motion. Indeed, he now relies extensively on the same newspaper articles and television and radio broadcasts presented to the trial court by defense counsel. Rather, he argues that because many of the prospective jurors (including the actual jurors) had been exposed to some pretrial publicity, he could not receive a fair trial and counsel should have renewed the motion. Although, as defendant points out, seven of the 12 jurors and three of the five alternates had been exposed to pretrial publicity, our independent evaluation of the record reveals that, for the most part, few jurors recalled the specifics and none had formed a resolute impression of defendant's guilt. Instead, all of the jurors and alternates expressed that they could be fair and impartial.

In light of these responses, counsel could have recognized that the effect of the publicity had not been as substantial as feared, especially after a year and one-half interim, and that a renewed motion to seek a change of venue would have been futile. (*People v. Bolin, supra,* 18 Cal.4th at p. 314.) Indeed, defendant used only 23 of his 26 allotted peremptory challenges to excuse jurors from the panel and only three of his five challenges to excuse alternate jurors. " 'The failure to exhaust peremptories is a strong indication "that the jurors were fair, and that the defense itself so concluded." [Citation.]' (*People v. Price* [(1991)] 1 Cal.4th [324,] 393 [3 Cal.Rptr.2d 106, 821 P.2d 610].) This last point can be decisive. (*People v. Daniels* (1991) 52 Cal.3d 815, 853-854 [277 Cal.Rptr. 122, 802 P.2d 906].)" (*People v. Dennis* (1998) 17 Cal.4th 468, 524 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; cf. *Gallego v. McDaniel* (9th Cir. 1997) 124 F.3d 1065, 1071-1072 [absence of actual prejudice evidenced by seven jurors who were passed over for cause].)

Because defense counsel could have reasonably decided not to renew the motion for a change of venue, and because the record indicates that the pretrial publicity did not affect the jurors' ability to decide the case fairly, defendant has failed to establish error or prejudice. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.) We will not second-guess counsel's preference for this particular jury over another, unknown jury panel. (See *People v. Bolin, supra,* 18 Cal.4th at p. 314; *White v. State* (1996) 221 Ga.App. 860 [473 S.E.2d 539, 543]; *Solomon v. Commissioner of Correctional Services* (E.D.N.Y. 1992) 786 F.Supp. 218, 227.)

### 3. *Contentions Regarding Severance Motions*

#### a. *General principles*

Defendant makes several arguments complaining of the joinder of the Weeden murder and Jacqueline H. rape charges. Joinder and severance of different criminal charges against the same defendant are governed by section 954, which states that an "accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." As we have held, "Offenses falling within this description, but charged in separate pleadings, may be consolidated for trial in order to promote judicial efficiency (see *People v. Mason* (1991) 52 Cal.3d 909, 935 [277 Cal.Rptr. 166, 802 P.2d 950]), and a trial court's rulings on joinder are reviewed for abuse of discretion (*People v. Cummings* (1993) 4 Cal.4th 1233, 1283-1284 [18 Cal.Rptr.2d 796, 850 P.2d 1])." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1074 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

#### b. *Severance of the Weeden murder*

Defendant made no motion to sever the Weeden murder count from the other charges. Defendant now claims that the trial court erred in failing, sua sponte, to sever his trial on the Weeden murder or to give limiting instructions, and that this error violated his right to due process and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and analogous provisions of the California Constitution. He also argues that he was deprived of the effective assistance of counsel because his attorney failed to move for severance and to request the appropriate limiting instruction. As explained below, we reject those claims.

i. *Failure to sever or to request severance*

*People v. Hawkins* (1995) 10 Cal.4th 920, 939-940 [42 Cal.Rptr.2d 636, 897 P.2d 574], disposes of defendant's claim that the trial court had a sua sponte duty to sever. ■ There, we stated: "Section 954, however, imposes no sua sponte duty of severance on trial courts. That section, as quoted above, requires the defendant to make a showing of 'good cause' in order to obtain severance, and defendant's failure to request a severance waives the matter on appeal. Nor do we find any authority to support defendant's argument that the Fifth, Sixth, Eighth or Fourteenth Amendments of the United States Constitution, or their California counterparts, impose such a duty." (*Id.* at p. 940.) Because defendant failed to request severance of the Weeden murder count, he has forfeited his claim.

■ Regarding defendant's ineffective assistance of counsel claim, we find neither incompetence of counsel nor prejudice resulting from his attorneys' failure to move for severance. (See *Strickland v. Washington, supra,* 466 U.S. at pp. 687-694 [104 S.Ct. at pp. 2064-2068].) Defendant argues that a motion to sever, had it been made, should have been granted because the joinder of the Weeden murder case, which was "very weak," with the other charges, unfairly prejudiced him. In addition, he argues that his sole defense of duress could not be raised because the joinder of the multiple murder charges allowed the prosecution to allege the multiple-murder special circumstance, which resulted in the classification of the Weeden homicide as a death-eligible crime. However, the trial court would not have abused its discretion by denying a motion to sever.

First, the murder offenses fall within the same class of crimes and thus were properly joined. (*People v. Bradford, supra,* 15 Cal.4th at p. 1315 [murder offenses belong to the same class of crimes].) Second, there was a common and distinctive modus operandi in all of the murders. To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed the crimes. (*Id.* at p. 1316.) The victims were females who were acquainted with defendant. There was evidence that all three murder victims died from strangulation. Landreth testified that the same Secret Witness caller requested reward money in exchange for information on the location of the bodies of all three victims. Apart from these three victims, the Secret Witness program had never received any other requests for reward money in return for a tip on the location of a body. Moreover, the caller waited until after the bodies had decomposed to make the Secret Witness calls. Thus, evidence of the distinctive Secret Witness calls made by the same person on all three offenses reflected common elements of substantial importance.

Further, evidence relating to the Berryhill and Stark offenses would have been admissible at a separate Weeden murder trial on the issue of the identity of the Weeden caller. The evidence strongly indicated, particularly the surveillance of defendant at the Secret Witness drop-off point, that he made the Berryhill and Stark telephone calls. Indeed, defendant conceded that he had made these calls. On the other hand, defendant denied making the Weeden calls. Because Landreth believed that the same person made the Weeden, Berryhill, and Stark calls, evidence that defendant made the Berryhill and Stark calls was relevant to show that defendant made the Weeden calls.

Thus, the similarities of the offenses, together with evidence that defendant made all of the Secret Witness calls, were sufficient to establish a common modus operandi, raising a strong inference that defendant killed Weeden. Because evidence of the murders was cross-admissible, any likelihood of prejudice was dispelled. (*People v. Arias* (1996) 13 Cal.4th 92, 126 [51 Cal.Rptr.2d 770, 913 P.2d 980].) For that reason alone, no abuse of discretion would have occurred in denying severance. (*Id.* at p. 128.)

Moreover, defendant's assertions of prejudice are not supported by the record. First, the evidence in the Weeden murder case was far from weak. Defendant made inconsistent statements to the police. Initially, he denied any involvement in Weeden's disappearance, but then claimed that he was present during her murder and forced to strike her with a rock. Defendant made numerous admissions to Landreth (that Weeden's roommate "Bob" or "Robert" had killed her), Detective Ashmun (that Weeden had been strangled and hit on the head with a rock), and Detective Mundy (that Morris had strangled Weeden and forced him to strike her with a rock). He made more admissions to Norma Schwartz (that he had killed before), Beth Von Millanich (that he was happy and excited about being a suspect in the murder of his landlord), Tracy Trantham (that he knew who had killed Weeden, that she was a "snitch," that any "snitch deserved to die," and that he had killed before), and Cheryl Stapley (that he had killed his landlady, that he had been brought in for questioning and laughed that he had "got off of that," and that he "can get off of anything"). Finally, defendant told two or three different stories to Bill Chartier and taunted Detective Mundy that he would never really know what had happened to Weeden and Mundy would take her death to his grave.

Second, although the joinder of the murder charges gave rise to the special circumstance allegation (§ 190.2, subd. (a)(3)), we will reject defendant's claim that he was entitled to and thereby improperly deprived of a duress defense. (See, *post,* at pp. 421-422.) Thus, defendant has failed to show

prejudice from the joinder and the resultant conversion of the Weeden murder into a death-eligible crime.

Because much of the incriminating evidence in the Stark and Berryhill charges would have been used in a separate Weeden murder trial to prove identity, and defendant has failed to establish prejudice from the joinder, the trial court would not have abused its discretion by refusing to grant a motion to sever had such a motion been made. No reasonable probability existed that, had defense counsel moved for severance, the motion would have been granted. Accordingly, defendant has failed to establish prejudice from counsel's omission.

### ii. *Failure to give limiting instruction*

Defendant also contends that the trial court erred in failing to provide sua sponte an instruction limiting the jury's consideration of the Stark and Berryhill crimes in deciding defendant's guilt of the Weeden murder. The trial court has no sua sponte duty to give a limiting instruction on cross-admissible evidence in a trial of multiple crimes. (*People v. Hawkins, supra*, 10 Cal.4th at p. 942.) We similarly reject the claim that defense counsel was incompetent for failing to request a limiting instruction on the cross-admissible evidence. A reasonable attorney may have tactically concluded that the risk of a limiting instruction (suggesting to the jury that the evidence supporting the Stark and Berryhill murders was relatively strong) outweighed the questionable benefits such instruction would provide. (*Ibid.*)

### c. *Severance of the Jacqueline H. rape*

Defendant contends that the trial court erred in denying his motion to sever the Jacqueline H. rape count. He claims that the prosecution argued and the trial court incorrectly agreed that the evidence on the charges relating to Weeden, Berryhill, and Stark was admissible in the Jacqueline H. case to identify defendant as the rapist. Defendant argues that the evidence was not relevant in the rape case because the issue there involved consent, not identity. He mischaracterizes the basis for both the prosecution's argument and the trial court's ruling.

Immediately before Jacqueline H.'s testimony, defendant moved for judgment of acquittal of the assault with intent to commit rape charge relating to Stark and also moved to sever the rape charge relating to Jacqueline H. He explained that the purpose of the motion for acquittal was to "set up a basis for severance." He conceded that there were "clear grounds" to join the rape count with the assault with intent to commit rape count, but argued that,

because there was insufficient evidence to support the assault charge, the trial court should dismiss that charge. He further argued that, once the assault count disappeared, there would be no basis to join the rape charge with the three murder cases. The prosecution responded that the motion for severance was untimely because it should have been made before trial, but that, in any event, evidence relating to the Jacqueline H. rape was relevant as to the identity of the murderer of the three victims.

The trial court denied both motions. Although the court found the severance motion untimely, it then proceeded to rule on the merits. It found that evidence on the rape count would have been cross-admissible in a separate trial on the murder charges to establish the identity of the perpetrator and that the probative value of the cross-admissible evidence outweighed the prejudicial effect of joinder. Specifically, it found that the rape and the murders had the following similarities: defendant tightened a rope around Jacqueline H.'s neck before he raped her; Weeden and Berryhill were strangled with a clothesline rope and scarf, respectively; defendant told Detective Newsome that he had heard that Stark had been strangled; and the bodies of Berryhill and Stark were found and Jacqueline H. was raped in the same general remote area of Happy Valley. In addition, the court found that the boot string that defendant showed Dr. Curiale was cross-admissible evidence on the murder and rape charges and that the evidentiary strengths of the murder and rape charges were relatively similar.

Because the trial court correctly ruled on the merits, we need not decide the timeliness issue. Murder and rape are assaultive crimes against the person and, as such, are "offenses of the same class of crimes" within the meaning of section 954 and were properly joinable. (*People v. Arias, supra,* 13 Cal.4th at p. 127; *People v. Alvarez* (1996) 14 Cal.4th 155, 188 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Because the statutory requirements for joinder were met, defendant can establish error only on a clear showing of prejudice. (*People v. Koontz, supra,* 27 Cal.4th at p. 1075.) He has failed to meet that burden.

As the trial court ruled, the evidence of the rape would have been cross-admissible in separate trials on the murder charges. In addition to the similarities described by the court, there were other similarities relating to the murder and rape offenses. Berryhill, Stark, and Jacqueline H. were young, small, and slim women who knew defendant. Berryhill and Stark's disappearances and Jacqueline H.'s rape occurred within a short period of time of each other. Thus, the incidents disclosed a distinctive modus operandi tending to establish the killer's identity. (*People v. Bradford, supra,* 15 Cal.4th at p. 1316; *People v. Marshall* (1997) 15 Cal.4th 1, 28 [61

Cal.Rptr.2d 84, 931 P.2d 262].) Also, as with the Jacqueline H. offense, there was evidence that the attack on Stark was sexually motivated. Thus, evidence in support of the offenses against Stark and Jacqueline H. was cross-admissible on the issue of intent. (*Marshall, supra,* at p. 28; *People v. Davis* (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Because evidence of the murders and rape was cross-admissible, no abuse of discretion occurred in failing to sever. (*People v. Arias, supra,* 13 Cal.4th at p. 128.)

### C. *Guilt Phase Issues*

#### 1. *Sufficiency of the Evidence*

Defendant contends the evidence, in several respects, was insufficient to support the judgment. ■ In reviewing a criminal conviction challenged as lacking evidentiary support, " 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hillhouse, supra,* 27 Cal.4th at p. 496.) The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618]), and to special circumstance allegations (*People v. Ochoa, supra,* 19 Cal.4th at pp. 413-414). An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. (*Rodriguez, supra,* at p. 11.) As will appear, we reject defendant's attempts to reargue the persuasiveness of the evidence and conclude that the evidence was sufficient to support (1) the Stark murder and assault with intent to commit rape convictions, (2) the Berryhill murder and robbery convictions and robbery-murder special-circumstance finding, and (3) the Jacqueline H. rape conviction.

##### a. *Stark murder conviction*

■ Defendant contends that the evidence was insufficient to support his convictions for Stark's murder and the assault of Stark with intent to commit rape. We conclude that there was substantial evidence to support both convictions.

Disputing that he even knew Stark, defendant claims that there was not enough evidence to prove that Stark's death resulted from a homicide, as opposed to an accidental death or suicide, or that he killed her. To the contrary, evidence of defendant's connection to Stark's death was overwhelming. First, evidence of the Secret Witness calls and the similarities of

the victims established a pattern linking defendant with the killings. The jury could reasonably infer that defendant made all of the Secret Witness calls and provided information that only the killer or an eyewitness would know about Weeden, Stark, and Berryhill. On August 8, 1987, someone telephoned the Secret Witness program seeking a reward for information on the location of a body. Landreth recognized the caller's voice as the same person who had called with information on Weeden. She also believed that the caller was the same person who had called on September 11, 1986, and identified himself as defendant.

On August 17, 1987, when the caller gave directions to the body, he stated that the death occurred about one and one-half months ago, which coincided with the date of Stark's disappearance. He also related to Landreth that the boyfriend was responsible for the death and that he would leave information about the person responsible in an envelope when he retrieved the reward money. Although defendant left an empty envelope without any information as promised, the police found defendant's fingerprint on the envelope. Thus, defendant's fingerprint corroborated Landreth's belief that defendant was the Stark case Secret Witness caller.

Almost three months after Berryhill's disappearance, beginning on September 15, 1987, Landreth of the Secret Witness program began receiving a series of anonymous telephone calls relating to Berryhill. The caller had information on the location of Berryhill's body and began negotiating for reward money in return for that information. Landreth recognized the caller's voice as the same person who had previously called regarding Weeden and Olsten/Stark and decided to tape two of the telephone calls on September 22, 1987. Detective Mundy listened to the taped conversations and confirmed that the caller's voice belonged to defendant. In return for providing information on the whereabouts of Berryhill's body, the caller picked up the reward money at the title company office on September 22, 1987, as prearranged. During the surveillance, the police confirmed defendant's identity as the Berryhill case Secret Witness caller. Thus, there was ample evidence that defendant was the Secret Witness caller regarding all three women and that he knew that Stark had been killed.

Moreover, the similarities of the victims further linked defendant to the killings.[11] Weeden, Stark, Berryhill, and Jacqueline H. were small, petite women that defendant knew. The disappearances of Stark and Berryhill

---

[11]Defendant failed to object to the admissibility of "other crimes" evidence or ask for a limiting instruction. Consequently, he has forfeited his claim that evidence of the other two murders and one rape could not be used to prove identity. Because the evidence was admissible to prove identity, intent, and motive, we reject defendant's incompetence of

occurred only one week and two days after the Jacqueline H. rape, and their bodies were found in the same general area where Jacqueline H. had been raped. Also, it was undisputed that defendant was familiar with and took walks in that area. Moreover, two residents saw a man matching defendant's general description drive his motorcycle into the wooded area where Stark's and Berryhill's bodies were later found. One witness testified that he saw the man at least twice, while the other witness said she saw him about five times and that he stayed in the woods for about an hour. The visits occurred about a month or two before the police searched the area. Thus, the jury could reasonably infer that, before and/or during the Secret Witness calls, defendant periodically checked to make sure the bodies were still there to ensure that he would receive his reward money. It could further reasonably infer that the reward money motivated defendant, at least in part, to kill the women.

Second, defendant's actions and statements to the police and others amply supported a finding of guilt. Several days after Stark's body had been found, defendant spoke with Detective Newsome. Despite the fact that the identity and gender of the body had not been determined, defendant noted similarities between that case and the Weeden case: both bodies were female and had been discovered in the woods. Also, despite the fact that Stark's purse was not close to her body, defendant took Del Carlo to Stark's purse and knew that the purse contained material that would identify the body. When asked by Del Carlo if there was additional evidence that would help the police in solving the crime, defendant related that he could show him the location of a .357-caliber nickel-plated gun. Although Stark owned such a gun, the police did not find it in her purse. Defendant's brother described a small pistol similar to the one owned by Stark; he told the police that defendant had asked him to dispose of it. A blanket, similar to one owned by defendant, was found close to Stark's body.

On October 26, 1987, defendant told Detective Newsome that he had heard Stark was strangled and that he would reveal the location of the murder weapon when he met with Dr. Curiale on October 30. Yet, during the interview with Dr. Curiale, defendant claimed he did not know anything about Stark's death. At the end of the interview on that date, defendant pulled out a boot string from his jacket and commented that Dr. Curiale should have searched his jacket because it would have given her some insight into who he was. Thus, the jury could reasonably infer from defendant's admissions, as well as the inconsistencies of his statements, that he had strangled Stark with a boot string and left her body in the woods.

---

counsel claim. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403 [27 Cal.Rptr.2d 646, 867 P.2d 757]; *People v. Daniels, supra,* 52 Cal.3d at pp. 856-858.)

Finally, the jury could reasonably reject defendant's claim that he did not know Stark and discovered the body accidentally. Defendant told a newspaper reporter that he had never seen Stark and had not been in Fall River Mills since 1977. However, three witnesses testified that they had seen defendant in Fall River Mills, either staring at Stark or with her before her disappearance. He also told the same reporter and Del Carlo that the "real killer" had confessed to the killings of Stark and Berryhill and that defendant discovered the location of their bodies from the killer. Thus, defendant's extrajudicial statements conflicted with the testimony of impartial witnesses and with his own defense.

Defendant makes much of the fact that the experts could not determine the cause of Stark's death. However, the prosecution and defense experts agreed that Stark died of unnatural causes. Also, the evidence at the scene reasonably supported an inference of sexual activity or an effort to that end. Dr. Boyd Stephens, the coroner, concluded that someone besides Stark had removed her pants: her pants and underpants were away from the area where her body had decomposed and were not stained with decomposition fluids; one of her pant legs was partly reversed, with the pant leg rolled up; the pants zipper had been zipped down completely and her panties were completely inside out; and one of her socks and shoes were still on her foot. Further, there was no evidence explaining why Stark would be in a wooded, remote area by herself or that she frequented or ever visited the area. Moreover, it was undisputed that she had planned to travel to Nevada City from Fall River Mills to attend a court appearance on June 29, 1987, but never made it. Her boyfriend testified that he last saw Stark on or about June 25, 1987, when she told him of her travel plans. Her friend, Lucy Gray, believed that she last saw Stark on June 24, 1987. In light of defendant's extrajudicial admissions, Dr. Stephens's testimony, and the circumstances of Stark's disappearance, defendant's assertion that Stark's death resulted from an accident or suicide is simply speculative.

Accordingly, the jury could reasonably infer from the evidence that defendant knew, strangled, and killed Stark; that he waited several months for the body and the evidence to decompose before attempting to gain reward money; that he was the Secret Witness caller who provided details about Stark that only the killer would know; and that he lied to the police, revealing a consciousness of guilt.

b. *Stark assault with intent to commit rape conviction*

Sufficient evidence also supported the conviction for assault with intent to commit rape. ■ " 'The essential element of [assault with intent to

commit rape] is the intent to commit the act against the will of the complainant. The offense is complete if at any moment during the assault the accused intends to use whatever force may be required.' " (*People v. Davis, supra,* 10 Cal.4th at p. 509.) " '[I]f there is evidence of the former intent and acts attendant to the execution of that intent, the abandonment of that intent before consummation of the act will not erase the felonious nature of the assault.' " (*Id.* at pp. 509-510.)

Defendant argues that the prosecution failed to prove that he was the person responsible for the assault, that Stark did not consent to sexual intercourse, that someone intended to rape Stark, and that any sexual assault occurred before Stark's death. Based on Stark's clothing, as reflected above, Dr. Stephens concluded that someone besides Stark had removed her pants and that the scene was consistent with the occurrence of a sexual assault. Although defendant argues that the scene is also consistent with consensual sex, the jury could reasonably infer an assault from the evidence that Stark had suffered a fractured jaw at or near the time of death, that she was strangled and killed by defendant, and that nothing consensual had occurred. Moreover, the prosecution was not required to prove that a rape had occurred, but only that Stark had been assaulted with an intent to commit rape. Based upon Dr. Stephens's testimony and evidence that defendant forcibly raped Jacqueline H. in the same area less than a week before the assault, the jury could reasonably infer that defendant assaulted Stark with the intent to rape.[12] (See *People v. Davis, supra,* 10 Cal.4th at pp. 509-510.)

### c. *Berryhill murder conviction*

██ Defendant argues that the evidence does not support the Berryhill murder conviction. He is wrong. First, there is credible evidence that Berryhill was last seen with defendant before her disappearance and that she planned to meet with defendant on the night of June 22, 1987, to buy some marijuana at "Big Mama's house."

Second, defendant told different stories about his plans on the night Berryhill disappeared. Defendant admitted to the police that he had been

---

[12]Sergeant Wooden testified that, although there were no decomposition fluid stains on Stark's pants, he detected a "light odor" of decomposition and saw a grease-like stain on the pant leg. Defendant argues that the "light odor" and stain are conclusive evidence of the presence of decomposition fluid, which establishes that Stark's pants were removed after her death. Not so. There was no scientific evidence linking the "light odor" and stain to decomposition fluid. The jury could reasonably conclude that they were caused by something other than human decomposition fluid. Moreover, defendant's argument that the pants were removed after Stark's death is not dispositive; the jury could still reasonably conclude that Stark had been assaulted while alive and that defendant intended to rape her during the assault.

with Berryhill on the day of her disappearance, but denied that he took her anywhere that night. Defendant claimed that on the night Berryhill disappeared, he had been on a date with a Leanne Thurman and that he had been late for his date because he had been with his friend Dave Hancock at the home of Hancock's boss. Although Hancock could not remember the precise date, he testified that, during the summer of 1987, he and defendant were at his boss's home when defendant related that he needed to return home because he was late for a date that night. Defendant drove off on his maroon Yamaha motorcycle for the date. Sometime afterwards, defendant revealed to Hancock that the date was with Berryhill, but that she had already left by the time he arrived. Thus, the jury could reasonably infer that defendant lied about his date with Thurman and that he was really with Berryhill on the night she disappeared.

Third, as with the Stark crimes, the jury could reasonably consider the similarities of the victims and infer that defendant made all of the Secret Witness calls and provided information that only the killer or an eyewitness would know about Weeden, Stark, and Berryhill. The caller (defendant) described the location of the body and said that Berryhill had been strangled with a scarf. When the police found Berryhill's body that same day, her body was covered with a mattress and pine needles. After removing the mattress, the police determined that a scarf was wrapped around the neck area of the vertebra; however, the scarf was not immediately evident. Goldie Lane, Berryhill's neighbor, identified the clothing and scarf found on Berryhill's body as the same items she had worn on the night of her disappearance. Finally, defendant's extrajudicial statement to Landreth that he "saw her boyfriend do it to [Berryhill]" conflicted with his defense.

Accordingly, the jury could reasonably infer from the evidence that defendant was the last person seen with Berryhill on the night before her disappearance; that he strangled her that night with the same scarf she wore when she left the house; that he waited several months for the body and the evidence to decompose before attempting to gain reward money; that he was the Secret Witness caller who provided details about Berryhill that only the killer would know; and that he lied to the police thereby revealing a consciousness of guilt.

 d. *Berryhill robbery conviction and robbery-murder special-circumstance finding*

■ Defendant asserts that the robbery conviction should be reversed because of insufficient evidence that Berryhill had any money on her when she was killed or that any money was taken by force or fear. (*People v.*

*Morris* (1988) 46 Cal.3d 1, 20, fn. 8 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Similarly, he argues that there was insufficient evidence to support the robbery-murder special-circumstance finding because the evidence showed the perpetrator's primary criminal goal was not to steal but to kill and the robbery was merely incidental to the murder. (*Morris, supra,* at p. 21.) To the contrary, there was substantial evidence that Berryhill was robbed and that she was murdered while defendant was engaged in the commission of a robbery.

On the day of her disappearance, Berryhill told her mother that she was going to meet "Bob" at 8:00 p.m. and go to "Big Mama's house" to buy marijuana. Williams gave her daughter $100. Before leaving the house on the night of her disappearance, Berryhill asked Lane for a ride to buy some marijuana. When Lane offered to babysit instead, Berryhill said she could get a ride from "a guy on a motorcycle." Berryhill said she had enough money to buy "some dope," showed Lane a roll of money, and placed it in her small hand purse. Soon afterwards, Berryhill was last seen riding off with defendant on his motorcycle. A larger purse was located near Berryhill's body. Lane testified that Berryhill carried her marijuana in the larger purse. Although Berryhill did not put her money in that purse, Lane stated that the purse with the money could fit inside the larger one. Because there was no marijuana in Berryhill's marijuana purse and the purse with the money was missing, the jury could reasonably infer that defendant stole either the money or marijuana from Berryhill. Moreover, because Berryhill was killed by strangulation with her own scarf, and only two days earlier defendant had forced Jacqueline H. to submit to rape by threatening to strangle her, the jury could reasonably infer that defendant strangled and killed Berryhill while engaged in the commission of a robbery. (§ 190.2, subd. (a)(17).)

" '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' " (*People v. Hughes* (2002) 27 Cal.4th 287, 357 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Even " '[i]f a person commits a murder, *and after doing so takes the victim's wallet,* the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money.' " (*Ibid.*) That defendant may have harbored a concurrent intent to kill does not invalidate the robbery-murder special circumstance. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1160 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Accordingly, substantial evidence supported the robbery conviction and the robbery-murder special-circumstance finding.

### e. *Jacqueline H. rape conviction*

Defendant claims that the evidence was insufficient to support his conviction for the rape of Jacqueline H. on two grounds. First, he argues that Jacqueline H.'s testimony was incredible, based on the absence of visible injuries and evidence that Jacqueline H. failed to report the rape or seek help afterwards, had a reputation as a liar, was a drug addict and convicted thief, and may have suffered from drug-induced paranoia. ■ In deciding the sufficiency of the evidence, we ask whether " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Hatch* (2000) 22 Cal.4th 260, 272 [92 Cal.Rptr.2d 80, 991 P.2d 165].) Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (*People v. Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758].) We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) The finding of guilt was amply supported by Jacqueline H.'s testimony.

■ Second, defendant contends that, even if Jacqueline H.'s testimony is believed, she never expressly stated that the act of sexual intercourse was against her will. Thus, he argues, the evidence was insufficient to show lack of consent. Defendant's claim is based on the remarkable and unsupported assertion that, because lack of consent and force or fear are separate elements, the same evidence cannot be used to prove "non-consent" and "force or fear." Contrary to his claim, evidence of force or fear is directly linked to the overbearing of a victim's will; the prosecution is required to demonstrate that the act of sexual intercourse was accomplished against the victim's will by means of force, violence, or fear of immediate and unlawful bodily injury. (*People v. Iniguez* (1994) 7 Cal.4th 847, 856 [30 Cal.Rptr.2d 258, 872 P.2d 1183].) We agree with the Attorney General that there is ample evidence from which the jury could reasonably infer that Jacqueline H. did not consent to sexual intercourse, i.e., her testimony that she feared for her life, that defendant rejected her request to take her home, that she disrobed and lay on the ground only after he placed and tightened a rope around her neck and ordered her to do so, and that, after the act of intercourse, she grabbed a screwdriver from a leather pouch attached to the motorcycle to protect herself.

### 2. *Evidentiary Issues—Voluntariness of Defendant's Statements*

Defendant contends that his statements to the district attorney and police in 1985 and to Dr. Curiale were involuntarily made.

a. *General principles*

In reviewing the voluntary character of incriminating statements, " '[t]his court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must "accept that version of events which is most favorable to the People, to the extent that it is supported by the record." ' ([*People v. Hogan* (1982) 31 Cal.3d 815,] 835 [183 Cal.Rptr. 817, 647 P.2d 93].)" (*People v. Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857].) "In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. [Citation.] . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness." (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873 [45 Cal.Rptr.2d 355].)

A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [98 S.Ct. 2408, 2416, 57 L.Ed.2d 290].) The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [83 S.Ct. 917, 920, 9 L.Ed.2d 922].) " 'The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." [Citation.]' [Citation.] In determining whether or not an accused's will was overborne, 'an examination must be made of "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." [Citation.]' [Citation.]" (*People v. Thompson, supra,* 50 Cal.3d at p. 166.)

A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. (*People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330], citing *Colorado v. Connelly, supra,* 479 U.S. at p. 167 [107 S.Ct. at pp. 521-522].) A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. (*Benson, supra,* at p. 778.) Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041 [60 Cal.Rptr.2d 225, 929

P.2d 544].) The statement and the inducement must be causally linked. (*Benson, supra*, at pp. 778-779.)

 b. *Admissibility of defendant's November 21, 1985, statements to district attorney and police*

On November 21, 1985, Detective Mundy and District Attorney Carlton interviewed defendant. During the tape-recorded interview, defendant related that he walked in on the murder of Weeden by Morris and another man, that they tied defendant up at gunpoint and took him with them to dispose of Weeden's body, and that they threatened to kill him if he told anyone about their involvement in the murder. The trial court allowed the jury to hear the taped interview and admitted the tape recording and transcript of the interview into evidence. Defendant contends that because his November 21 statements were involuntarily made, the trial court violated his due process rights in admitting them into evidence. His claims lack merit.

First, defendant argues that the trial court erred in failing to rule expressly on the voluntariness of his November 21, 1985, statements. However, the record reflects no error. As part of his section 1538.5 pretrial motion to suppress evidence, defendant moved to suppress his November 21 statement. In rejecting defendant's Fourth Amendment claim and denying the suppression motion relating to that statement, the trial court expressly found that the November 21 statements were "voluntary beyond a reasonable doubt." During trial, the trial court asked the parties whether the voluntariness of the November 21 statements was a "contested issue." The following discussion occurred:

"[DEFENSE COUNSEL]: I don't think we have any problem with the statements made in '85. Now, the defense is constrained from—or at least we do not wish to stipulate to the admission of any of these statements.

"THE COURT: Right.

"[DEFENSE COUNSEL]: Then, again, we don't wish to be obstreperous either, so I don't think there's an issue of voluntariness as to the '85 statements."

"[DEFENSE COUNSEL]: Let me suggest that the parties get together and I think we can agree at least to disagree and form the issues so it can be done quickly Tuesday morning, if necessary. And whatever rulings would be necessary—I certainly don't expect anything on the '85 tape.

"[PROSECUTOR]: You don't expect anything what?

"[DEFENSE COUNSEL]: Challenge on the voluntariness."

Later, when the prosecutor introduced the tape and transcript of the interview into evidence, defense counsel objected only to the accuracy and use of the transcript. Although the trial court did not expressly find that the November 21 statements were voluntarily made, such finding was implied from the court's order admitting the statement into evidence. (Evid. Code, § 402, subd. (c) ["[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute"]); *People v. Daniels* (1969) 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675].) In light of defendant's failure to object to admission of the evidence on voluntariness grounds, the lack of an express finding on that issue was not error.

Defendant argues that if the trial court's admission implies a finding of voluntariness, such finding was erroneous. He claims that the November 21 statements were involuntary as a matter of law because they were induced by a promise of leniency on an unrelated possession of stolen property charge and an agreement that defendant's statements would not be used against him on the Weeden murder. The record fails to support defendant's claim.

In November 1985, before his court appearance on the unrelated stolen property case, defendant spoke to Shasta County Sheriff's Detective Ashmun. Defendant volunteered that he had information on the Weeden homicide, and wanted "consideration" on the case he was currently facing and "immunity" on the Weeden case. Defendant stated that Weeden had been strangled and hit in the head. After defendant's statements, Detective Ashmun said he *might* help defendant on the stolen property case if he had helpful information on the Weeden case. Detective Ashmun told Detective Mundy, the investigator on the Weeden case, that defendant had information about the Weeden murder and was willing to talk about it.

Detective Mundy met with defendant on November 20, 1985. Defendant told Detective Mundy that he would be willing to talk to him "conditionally" and that he wanted to talk about "immunity." Detective Mundy responded that he "could not grant immunity, that it would have to come from the district attorney." The detective arranged to have another interview with defendant on the next day.

On November 21, 1985, Detective Mundy and District Attorney Carlton interviewed defendant at his residence. At the beginning of the interview, defendant informed them that he had pleaded guilty to the crime of possession of stolen property and was facing county jail time on the conviction. He

further stated that Detective Ashmun seemed to think that "if I cooperated in this investigation, then I *might* not get no jail time . . . and that was one of the things *I would like to get out of this*, assuming I know anything that can help you." (Italics added.) When District Attorney Carlton began to reply, "I can't tell you before . . ." defendant interrupted and said, "Right, I'm not asking." The district attorney continued to say that he could not tell defendant whether he would benefit before they heard his statement and determine its truthfulness. Defendant then acknowledged, "Well, I'll start off by telling you what happened that day," and "you can answer a couple of my questions."

Defendant gave a lengthy statement in which he blamed Morris and another man for Weeden's death. At the end of the interview, defendant explained that, if not for the impending jail commitment, he would never have come forward with the information. He reiterated that he wanted to avoid jail time and that Detective Ashmun said he "*might* be able to get off easy." (Italics added.) Although, as defendant argues, *his motivation* was to avoid jail time on the unrelated case, his further claim that the authorities promised consideration on the unrelated case in return for information on the Weeden case is unavailing.[13]

Similarly, no promises of immunity were made as to the Weeden case. At the beginning of the interview, defendant said he did not want to be arrested and jailed immediately for telling them "things that somebody else might not know." He stated, "I know I can't get charged with murder because I didn't do it, a, immunity that way, *I'm not really worried about it, immunity* that anything, see if I was to come up with some information that not very many people should know, I don't want that used against me, saying I did it just because I know that." (Italics added.) The district attorney informed defendant that immunity had "not been granted to you," that "you're not being offered immunity," and that "I don't have the power to give you immunity anyway, you understand that."

Defendant replied, "I understand that, but I don't wanna be thrown in jail for an accessory that I had nothing to do with, j—just because . . . .

"[CARLTON]: *Okay.*

"[DEFENDANT]: I happened to walk in on something, there's no reason I should have to go to jail for it.

"[CARLTON]: *Okay,* I'm not, I'm not questioning that, what I'm trying to talk to you about is, there has been some mention of, of immunity in this case and immunity has *not* been granted and you *don't have* immunity."

---

[13]Although there were no promises made, defendant received three years' probation on a felony conviction of possession of stolen property without a county jail commitment.

"[DEFENDANT]: [Inaudible], *I realize that.*

"[CARLTON]: And if a, if it ever came to be, that we wanted to give you immunity, we'd have to hear what you had to say and we'd have to evaluate and investigate to determine whether we thought it was truthful or not. Do you understand that?

"[DEFENDANT]: Yes sir.

"[CARLTON]: Okay.

"[DEFENDANT]: So I have nothing.

"[CARLTON]: Well, I'm not, I'm not saying that . . . I'm not saying that you, a, that immunity won't sometime be offered to you, but immunity would never be offered to you until we knew what we were getting." (Italics added.)

Focusing on isolated fragments of the conversation, defendant argues that the district attorney implicitly assured defendant twice that the information would not be used against him. Twice, when defendant stated his desire that the volunteered information would not be used against him, the district attorney merely prefaced his responses with "Okay." We fail to see how that phrase equates to such an agreement, especially in light of Carlton's express and repeated statements that immunity was *not* being granted at that time.

Finally, defendant contends that the district attorney engaged in "unethical conduct" by violating then rule 7-103 of the California Rules of Professional Conduct, which provided, in pertinent part, that "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel *upon a subject of controversy* without the express consent of such counsel. . . ." (Italics added.) However, defendant was represented by counsel only on an unrelated charge and not on the Weeden murder. (See *People v. Webb* (1993) 6 Cal.4th 494, 527 [24 Cal.Rptr.2d 779, 862 P.2d 779] [Sixth Amendment right to counsel is "offense-specific," i.e., it attaches only to those offenses for which adversary judicial criminal proceedings have begun].) He fails to establish the applicability of the rule to the district attorney's conduct or how an alleged breach of the ethical rule affected the verdict. Indeed, we fail to see how admission of defendant's statements "seriously undermined his defense," as defendant

claims, since his extrajudicial statements to the police formed the evidentiary basis for his defense that Morris killed Weeden.[14]

### c. *Admissibility of defendant's statements to Dr. Curiale*

■ Defendant claims that the trial court committed prejudicial error in admitting certain statements that he made to Dr. Curiale, a psychologist with the Department of Corrections, on the grounds that they were made involuntarily and were privileged (Evid. Code, § 1012). Dr. Curiale interviewed defendant on October 23 and 30, 1987. At trial, defendant objected to admission of all of his statements during the interviews on the ground that they were made involuntarily and were more prejudicial than probative, under Evidence Code section 352. After an evidentiary hearing, which included a review of the entire taped interviews, the trial court concluded that defendant's statements were voluntarily made. It made the following findings: "I think [defendant] voluntarily put himself in the position of being interrogated, with full knowledge that he was waiving his rights, and he fully understood what Dr. Curiale's position was and what her intentions were, and he demonstrated that constantly throughout the tapes."

The trial court ruled that, under Evidence Code section 352, portions of the interviews were irrelevant and playing the entire tapes would be time-consuming. It instructed the prosecutor to edit the tapes. The court allowed the jury to hear limited portions of the taped interviews and admitted an edited transcript of those limited portions.

After reviewing the record, we find that defendant's statements were voluntarily made. It is undisputed that defendant's statements to Dr. Curiale were made during noncustodial interviews. At the evidentiary hearing, Detective Newsome testified that during a September 29, 1987, interview with defendant at his brother's house, defendant initiated a discussion about talking to a psychiatrist and said he would be willing to talk to one if the police made the arrangements and payment. At another interview on October 5, defendant offered to talk to a psychiatrist again. When the police accused defendant of the murders and asked if he needed help, defendant denied that he killed anyone, declared that they could not prove it, and encouraged Detective Newsome to find "the best criminal psychologist or psychiatrist" because he or she would say defendant was "not capable of these things." He

---

[14]Defendant also alleges that defense counsel were incompetent for failing to object to his "involuntary" statements to Detective Ashmun that Weeden had been strangled and hit in the head. As with the November 21, 1985, interview, no promises were made in exchange for information on the Weeden case. Detective Ashmun simply said he *might* help defendant on the unrelated case. Because the claim lacks merit and because his statements formed the basis for his defense, counsel cannot be faulted for failing to object.

also challenged Detective Newsome to "take [him] to a jury trial to prove that [he] did it."

The police asked Dr. Curiale to interview defendant to assist them in determining if defendant committed the crimes and in obtaining information, evidence, or, if possible, a confession from defendant. On October 23, 1987, defendant met Dr. Curiale and Detective Newsome at the lobby of the Shasta Inn, but then spoke with Dr. Curiale alone. At the beginning of the interview, defendant stated: "You're going to tell me that . . . things that I can say, can will be used against me and maybe you're not going to read me my rights, but you are going to advise me of the fact that whatever information you might get from me will be used against me and these will be turned over to the police whether it turns up people or not. I already know all that. I, I don't have to be here talking to you." Dr. Curiale responded, "Right," and emphasized that, because she was working for law enforcement, the privilege and confidentiality "rests with them." Defendant replied that he understood. Also, at some point, defendant commented that the interview was probably being taped. Before the interview ended, they agreed to meet again.

On October 30, 1987, defendant met Dr. Curiale in the same lobby. During the interview, Dr. Curiale commented that defendant had not told her anything more than what she had read in the police reports or newspapers. Defendant responded, "I told you the first time I met you that I would never tell you anything that I knew would be a mistake or could get me thrown in jail . . . there's no way that I'm gonna ever tell you anything that you're gonna be able to use to throw me in prison, I have not lied to you in that respect." When Dr. Curiale responded, "No you haven't, you've been very consistent in that, but I'm not interested in what gets you to prison," defendant expressed his skepticism by stating, "Sure you are, because whatever I tell you, you'll tell them, now if I was to hire you, and a, or the County was to hire you on my behalf or whatever and the anonymity and everything laid with between us, well then, you know, might be a different story. But right now, they're pulling your strings, not me and not the County, well I guess in a way the County, but like a mental health program." Detective Newsome and Dr. Curiale testified that defendant ended both interviews himself and left.

Thus, the evidence reflects that defendant offered to talk with a psychologist, voluntarily met with Dr. Curiale twice, knew that he was not required to talk with her, was not in custody during the interviews, and was free to end the interview and leave at any time, which he did. Even though he understood that his statements were not confidential, would be related to the police, and could be used against him, defendant freely spoke with Dr.

Curiale. (*People v. Henderson* (1977) 19 Cal.3d 86, 97-98 [137 Cal.Rptr. 1, 560 P.2d 1180].)

Nevertheless, defendant claims that his statements were involuntary because (1) he was intoxicated by marijuana during the interviews, (2) Dr. Curiale used psychological manipulation to coerce his incriminating statements, and (3) law enforcement coerced defendant into seeing a psychologist by harassing him and his family. The evidence reflects otherwise. Regarding the intoxication allegation, both Dr. Curiale (who saw and heard defendant during the interviews) and Detectives Newsome and Mundy (who overheard defendant during the interviews) testified that he did not appear to be under the influence of a drug, that he appeared to understand the questions asked of him, that he responded and asked questions appropriately, and that his conversations were coherent and intelligent. Although defendant smoked a cigarette that he said was marijuana during the October 30, 1987, interview, Dr. Curiale stated that his behavior did not change after smoking it. Moreover, absent state coercion, defendant cannot complain that any self-induced intoxication rendered his statements involuntary. (See *Colorado v. Connelly, supra,* 479 U.S. at p. 163 [107 S.Ct. at pp. 519-520].)

Regarding the psychological manipulation claim, although the evidence reflects that Dr. Curiale tried to trick defendant into admitting his guilt, defendant recognized the attempted ruse and refused to succumb to any deception. In an attempt to get more information from defendant, Dr. Curiale represented that she was "off duty," implying that she was no longer working for the police. Also, Dr. Curiale attempted to elicit incriminating evidence by comparing defendant to a notorious killer who had received much publicity and by promising that defendant would be in her book. As the trial court correctly found, the evidence reflects that defendant did not believe her and was not influenced by Dr. Curiale's techniques. Deception does not necessarily invalidate an incriminating statement. (*People v. Thompson, supra,* 50 Cal.3d at p. 167; see also *Illinois v. Perkins* (1990) 496 U.S. 292, 297 [110 S.Ct. 2394, 2397, 110 L.Ed.2d 243] ["mere strategic deception" not coercive].) "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray, supra,* 13 Cal.4th at p. 340.) In this case, Dr. Curiale's ploys do not fall into that category.

Regarding defendant's harassment claim, there is conflicting evidence. Defendant's brother testified that Detectives Newsome and Mundy repeatedly accused defendant of being gay, illiterate, and a mass murderer, and having a split personality. On the other hand, although the detectives told

defendant and his family they believed he was guilty of one or more of the murders, they denied making the first three accusations. With respect to this conflicting testimony, we must accept that version of events which is most favorable to the People, to the extent that it is supported by the record. (*People v. Thompson, supra,* 50 Cal.3d at p. 166.) On the other hand, the detectives admitted that they considered the possibility that defendant may have had a split personality ("good Bob/bad Bob") and may have mentioned that possibility to defendant and his family. Even if the police had mentioned to defendant and his family of their belief in a "good Bob/bad Bob," this does not amount to official coercion. Defendant initiated the topic of a psychiatrist and offered to talk to one for the purpose of exonerating himself. Indeed, during the interview, he repeatedly denied any responsibility for the murders, in accordance with his planned purpose. Thus, defendant's will was not overborne when he spoke to Dr. Curiale. (*Lynumn v. Illinois, supra,* 372 U.S. at p. 534 [83 S.Ct. at pp. 920-921].)

On the claim of privilege, because defendant failed to object to admission of his statements on this ground, it is forfeited. (Evid. Code, § 353, subd. (a); *People v. Sims* (1993) 5 Cal.4th 405, 448 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People v. Collie* (1981) 30 Cal.3d 43, 49 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) In any event, the claim is meritless. The evidence is uncontradicted that the purpose of Dr. Curiale and the police for the interview was to obtain information and evidence from defendant, and *not* to conduct psychological treatment or a psychological evaluation or render a diagnosis. (*People v. Henderson, supra,* 19 Cal.3d at pp. 97-98; *People v. Cabral* (1993) 12 Cal.App.4th 820, 826-828 [15 Cal.Rptr.2d 866].)

Finally, even if defendant's statements were involuntary, their admission was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279 [111 S.Ct. 1246, 113 L.Ed.2d 302]; *People v. Cahill* (1993) 5 Cal.4th 478, 509-510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) Although the taped statements were lengthy, the prosecution admitted only limited portions of the interviews. During the edited version, which the jury heard, defendant stated that he had "no conscience," and that, although he did not serve in Vietnam, he wanted to "rape, burn, pillage, kill" the Viet Cong. He commented that the Secret Witness program "bred crime by paying people to turn in bodies" and that "a person could almost make a living by killing people and later turning in their bodies for the reward." At the end of the interview, defendant pulled out what appeared to be a boot string from his pocket and told Dr. Curiale that she should have searched his coat while she had the chance because it would have given her insight into who he was. However, defendant steadfastly denied any responsibility for the murders and offered no information about them. Given the overwhelming evidence against defendant, admission of his statements was not prejudicial.

### d. *Admissibility of polygraph evidence*

Defendant challenges the exclusion of evidence that he passed a polygraph examination. According to defendant's offer of proof, he "passed" the polygraph test regarding the death of Weeden. He argued that evidence of the test results was relevant to identify Weeden's murderer and he sought to introduce the polygraph evidence to support his extrajudicial statements that someone else killed Weeden. Defendant requested an evidentiary hearing to establish the "validity" of the polygraph examination and the examiner's "expert qualification." Relying on Evidence Code section 351.1, the trial court denied defendant's motion for an evidentiary hearing. Defendant claims that the trial court's refusal to hold an evidentiary hearing violated his Sixth and Fourteenth Amendment rights to present a defense and call favorable witnesses.

Evidence Code section 351.1 provides that the results of a polygraph examination or the opinion of a polygraph examiner "shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results."

Here, the trial court properly excluded the expert testimony regarding defendant's polygraph examination. Excluding such evidence does not violate defendant's constitutional right to present a defense. (*United States v. Scheffer* (1998) 523 U.S. 303, 312 [118 S.Ct. 1261, 1266, 140 L.Ed.2d 413] [per se military rule excluding all polygraph evidence in court-martial proceedings does not abridge defendant's Fifth or Sixth Amendment right to present defense].) In finding that a per se rule excluding all polygraph evidence was not arbitrary or disproportionate in promoting the legitimate interest of ensuring that only reliable evidence is introduced at trial, the high court stated: "[T]here is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." (*Id.* at p. 309 [118 S.Ct. at p. 1265].) "This lack of scientific consensus is reflected in the disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence." (*Id.* at pp. 310-311 [118 S.Ct. at p. 1265], fn. omitted.) Implicit in the Legislature's passage of Evidence Code section 351.1 is the conclusion that "[L]ie detector tests themselves are not considered reliable enough to have probative value." (*People v. Thornton* (1974) 11 Cal.3d 738, 764 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) A per se rule excluding polygraph evidence is a "rational and proportional means of advancing the legitimate interest in barring unreliable evidence." (*Scheffer, supra,* at p. 312 [118 S.Ct. at p. 1266].)

Moreover, contrary to defendant's claim, his defense was not significantly impaired by exclusion of the polygraph examination results. Although defendant *chose* not to testify, exclusion of the polygraph evidence did not preclude him from introducing any factual evidence of the charged offense and did not prohibit him from testifying on his own behalf. (*United States v. Scheffer, supra,* 523 U.S. at pp. 316-317 [118 S.Ct. at pp. 1268-1269]; see also *People v. Espinoza* (1992) 3 Cal.4th 806, 818 [12 Cal.Rptr.2d 682, 838 P.2d 204] [exclusion under Evid. Code, § 351.1 of defendant's offer to take a polygraph test did not violate due process; defendant was not foreclosed from effectively challenging prosecution's case or from presenting crucial exculpatory evidence].) Rather, defendant was barred merely from introducing expert opinion testimony to bolster his own credibility, in support of his extrajudicial statements. (*Scheffer, supra,* at p. 317.) "A polygraph is not so crucial that its absence precludes a defendant from mounting a defense." (*In re Aontae D.* (1994) 25 Cal.App.4th 167, 175 [30 Cal.Rptr.2d 176].)

In *People v. Wilkinson* (2002) 102 Cal.App.4th 72 [125 Cal.Rptr.2d 294], review granted December 11, 2002, S111028, we will decide whether Evidence Code section 351.1's exclusion of polygraph evidence is absolute or whether a defendant, on a proper showing, is entitled to a *Kelly/Frye* hearing regarding the admissibility of proposed defense polygraph evidence. (*People v. Kelly* (1976) 17 Cal.3d 24, 30-32 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [34 A.L.R. 145].) Even if the *Kelly/Frye* test remains applicable to polygraph evidence notwithstanding the enactment of Evidence Code section 351.1, we note that defendant's offer of proof was woefully inadequate. He failed to present an offer of proof that polygraph evidence was generally accepted in the scientific community. (*People v. Ayala* (2000) 23 Cal.4th 225, 264 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1212 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1122 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Defendant merely asserted that he would proffer evidence of the "competency" of the polygraph examination results, without saying what that evidence was or what he specifically sought to show. Thus, he is in " ' "no position to assign error in the trial court's ruling." ' " (*Jackson, supra,* at p. 1212.)

3. *Alleged Ineffectiveness of Counsel*

Defendant contends that defense counsel rendered ineffective assistance for (1) failing to object to evidence of Landreth's voice identification of defendant as the Weeden case Secret Witness caller, (2) failing to request a cautionary jury instruction relating to voice identifications, (3) failing to object to hearsay statements, and (4) failing to object to Jacqueline H.'s testimony. These contentions lack merit.

### a. *Failure to object to preliminary hearing voice identification*

At the preliminary hearing, defendant cross-examined Landreth while acting as his own cocounsel. At trial, Landreth testified that at the preliminary hearing, she recognized defendant's voice as the same person who had called the Secret Witness program in regard to Weeden, "Olsten," and Berryhill. There was no objection to this testimony. Defendant argues that counsel should have objected because Landreth's voice identification at the preliminary hearing (which she made "only to herself") was unreliable and the identification procedure was impermissibly suggestive. The Attorney General responds that because the identification procedure during the preliminary hearing was not unduly suggestive and Landreth's voice identification of defendant was reliable, counsel was not required to object since an objection would have been futile. We need not decide the merits of the claim because the record reveals that counsel's failure to object to testimony regarding Landreth's voice identification can reasonably be attributed to a choice of trial tactics because it was not critical evidence.

In 1985, Landreth spoke with the Secret Witness caller about the Weeden case at least six times. On September 11, 1986, Landreth received a telephone call from someone she recognized as the same person who had made the 1985 Secret Witness calls. The caller gave her information regarding an unrelated burglary and revealed his name. Landreth recalled that the caller may have said, "Well, this is Bob" or may have said his name was "Robert Maury." A week later, on September 19, the same person called again, this time asking Landreth for immunity on the Weeden case. She realized that the September 11 caller, who identified himself as "Bob" or "Robert Maury," was the same person as the Weeden case Secret Witness caller.

In August 1987, Landreth began receiving a series of telephone calls from the same caller regarding the location of "Olsten's" body. Landreth recognized that the voice belonged to the same person as the caller on the Weeden case and the unrelated burglary. She taped one of the telephone calls and played it for Detective Mundy to confirm that the voice belonged to the same Robert Maury whom she had spoken to before. Detective Mundy confirmed Robert Maury was the person on the tape.

During closing argument, defense counsel repeatedly attacked as unreliable Landreth's recognition of defendant's voice during the series of telephone calls. Thus, the record indicates that counsel believed that Landreth's recognition of defendant's voice in 1985 to 1987 was the critical evidence, and *not* her voice identification at the preliminary hearing. ██ Whether to object to arguably inadmissible evidence is a tactical decision; because

trial counsel's tactical decisions are accorded substantial deference, failure to object seldom establishes counsel's incompetence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1121 [36 Cal.Rptr.2d 235, 885 P.2d 1].) We cannot say that counsel's decision not to object to evidence of Landreth's preliminary hearing voice identification was not a legitimate tactical choice. (*People v. Davis* (1969) 270 Cal.App.2d 841, 844 [76 Cal.Rptr. 242] [failure to object to lineup procedure may have been legitimate tactical decision].)

In addition, because other independent evidence established that defendant was the Weeden case Secret Witness caller, counsel's failure to object to Landreth's preliminary-hearing voice identification was not prejudicial.

### b. *Failure to request cautionary instruction*

Defendant claims that counsel was incompetent for failing to request a pinpoint instruction for Landreth's preliminary-hearing voice identification, similar to CALJIC No. 2.92 (eyewitness identification). Because her voice identification was not crucial evidence, the failure to give a cautionary instruction as to that evidence was not prejudicial.

### c. *Failure to object to hearsay statements of Morris*

Bill Chartier, Weeden's brother, testified that Morris related that he saw Weeden riding off with defendant, on the back of defendant's motorcycle, and "that's the last time she was ever seen." Defense counsel did not object to this testimony. Defendant now claims that counsel was ineffective for failing to object to Morris's hearsay statement.

Here, given the overwhelming evidence establishing defendant's guilt of the Weeden murder, it is not reasonably probable that a determination more favorable to defendant would have resulted, in the absence of counsel's omission. (*Strickland v. Washington, supra,* 466 U.S. at p. 694 [104 S.Ct. at p. 2068].) The evidence reflected that defendant was the Secret Witness caller regarding all three murder victims. He knew the location of the bodies of the victims and used this information for financial gain. In addition, defendant made numerous admissions regarding Weeden's death to Landreth, Detective Ashmun, Detective Mundy, and various acquaintances, and gave several conflicting stories to Chartier regarding Weeden after her disappearance. Defendant argues that Morris's hearsay statement was the only direct evidence that rebutted defendant's assertion that Morris killed Weeden. Not so. In the spring of 1987, after he had told Detective Mundy that Morris killed Weeden, defendant declared that Detective Mundy "would never really know what happened to Averill Weeden" and that Mundy would

take her death to his grave. Because defendant has failed to establish prejudice, the issue of deficient performance need not be reached. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1126.)

#### d. *Failure to object to Jacqueline H.'s testimony*

Defendant contends that defense counsel were incompetent for failing to object to Jacqueline H.'s testimony on the ground that her testimony was coerced by the district attorney, in violation of his right to due process. Analogizing to accomplice testimony cases, defendant claims that Jacqueline H. agreed to testify in conformity with her preliminary hearing testimony in return for benefits promised by the district attorney. The evidence fails to support his claim.

" ' "[A] defendant is denied a fair trial if the prosecution's case depends substantially on accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." [Citation.] Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in defendant's conviction [citation], the accomplice's testimony is "tainted beyond redemption" [citation] and its admission denies defendant a fair trial. On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid.' (Fn. omitted.)" (*People v. Badgett* (1995) 10 Cal.4th 330, 358 [41 Cal.Rptr.2d 635, 895 P.2d 877].)

At trial, the district attorney asked Jacqueline H. if any promises were made to her in return for her testimony. Jacqueline H. replied, "I have been offered nothing. . . . Except for not having to do time in jail, in the same jail with [defendant]." At the time of trial, a burglary charge and bad check charge were pending against Jacqueline H. Both crimes had occurred and, obviously, both charges had been filed after Jacqueline H.'s preliminary hearing testimony in which she testified that defendant had raped her. Jacqueline H.'s attorney, representing her on both criminal cases, confirmed that the district attorney promised only that Jacqueline H. would not serve any time in the same jail with defendant in return for her testimony. Thus, the district attorney's promise was not conditioned on Jacqueline H. testifying in a particular fashion or on the testimony's achieving a particular result.

Moreover, unlike the accomplice cases, there was not "a certain degree of compulsion" inherent in Jacqueline H.'s agreement with the district attorney.

She did not avoid prosecution or receive a favorable criminal disposition in exchange for her testimony. Instead, as the Attorney General points out, Jacqueline H. was simply receiving an express assurance that the prosecution would make every effort to protect her from her assailant, an assurance any victim would reasonably expect from the prosecution.[15]

Nothing about the agreement was improperly coercive. Thus, counsel were not ineffective for failing to object to Jacqueline H.'s testimony on that ground. (*People v. Gurule* (2002) 28 Cal.4th 557, 617 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

### 4. *Alleged Prosecutorial Misconduct*

Defendant contends that the prosecutor committed various acts of misconduct during both the guilt and penalty phases, including misconduct during opening and closing arguments and introducing inflammatory and prejudicial evidence.[16] However, he did not object to any of these instances at trial. Because an objection could have cured any harm, the contentions are not cognizable on appeal.[17] (*People v. Hillhouse, supra,* 27 Cal.4th at p. 501.)

Defendant argues that there was no waiver because objections would have been futile. We have reviewed the comments defendant cites and find no pervasive misconduct indicating the futility of objecting. (*People v. Hillhouse, supra,* 27 Cal.4th at pp. 501-502; *People v. Riel* (2000) 22 Cal.4th 1153, 1212-1213 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Many of the prosecutors' comments were fair inferences drawn from the evidence. (*People v.*

---

[15]We reject defendant's claim that there were "unacknowledged" agreements that Jacqueline H. testify in a certain manner. Although bail had been reduced and the preliminary hearing had been delayed in Jacqueline H.'s criminal cases, defendant fails to establish any causal connection between these events and her testimony in this case. The fact that the district attorney filed criminal charges against Jacqueline H. *after* her preliminary hearing testimony indicates that Jacqueline H. did not receive "unacknowledged" benefits in exchange for her trial testimony.

[16]Although this claim involves both the guilt and penalty phases, we consider the entire claim here because the arguments are related.

[17]In addition to the forfeited prosecutorial misconduct claims, defendant contends that the Secret Witness program's payment to him for information on the location of the victims' bodies constituted outrageous government conduct in violation of his due process rights because it provided the incentive for murder. Because defendant failed to raise this claim or present evidence to support it, the claim is forfeited. In any event, it would fail. Even assuming the Secret Witness program acted as a government agent, its conduct fell far short of government conduct " 'so grossly shocking and so outrageous as to violate the universal sense of justice.' " (*U.S. v. Restrepo* (9th Cir. 1991) 930 F.2d 705, 712.) There was no direct and continuous government involvement in the *creation and maintenance* of criminal operations. (See *U.S. v. Mitchell* (9th Cir. 1990) 915 F.2d 521, 525-526 [due process prevents conviction where undercover agents engineer and direct the criminal enterprise from start to finish].)

*Osband* (1996) 13 Cal.4th 622, 700 [55 Cal.Rptr.2d 26, 919 P.2d 640].)
██ Moreover, the prosecutors' use of "I believe" before their argument that death was the appropriate penalty was not an improper injection of their personal beliefs, but simply a permissible "rhetorical device" to urge the jury, after weighing the aggravating and mitigating circumstances, to return a verdict of death. (*Id.* at p. 722 [" 'I think,' " preceding the argument that defendant should " 'have no recourse to our sympathies,' " did not improperly inject prosecutor's personal beliefs into the argument].)

Regarding some of the alleged instances of prosecutorial misconduct, defendant claims defense counsel were ineffective for not objecting. ██ However, deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 502; *People v. Scott* (1997) 15 Cal.4th 1188, 1223 [65 Cal.Rptr.2d 240, 939 P.2d 354].) As we explain, this is not one of those rare cases.

██ First, defendant claims that defense counsel should have objected to the prosecutor's "serial killer theme" during the opening and closing arguments in which the prosecutor often improperly referred to the crimes as "murders," to the perpetrator as a "killer," to the murders as part of a series of killings by the same person, and to defendant as a "serial killer." These references appear to be apt descriptions of the crime and the person who committed them. (*People v. Edwards* (1991) 54 Cal.3d 787, 840 [1 Cal.Rptr.2d 696, 819 P.2d 436] [use of the word "execution" was an apt description of the crime].) Moreover, counsel could have reasonably concluded that the prosecutor's comments, as well as his characterizations of the defense expert's testimony, were fair inferences drawn from the evidence. Thus, counsel cannot be faulted for failing to object. (*People v. Price, supra,* 1 Cal.4th at p. 387 [counsel not ineffective for failing to make futile objections].)

Second, defendant argues that the prosecutor improperly introduced various statements defendant made to Landreth, the police, Dr. Curiale, and Shelley Sly, and that defense counsel was incompetent for failing to object to these statements as inflammatory and prejudicial, improperly reinforcing the prosecutor's "serial killer theme." However, these statements were parts of interviews or conversations in which defendant made admissions establishing consciousness of guilt or made false statements as part of his attempt to evade detection and deceive the police. Evidence Code section 356 permits introduction of statements "on the 'same subject' " or which are necessary for the understanding of the statements already introduced. (*People v. Breaux* (1991) 1 Cal.4th 281, 302 [3 Cal.Rptr.2d 81, 821 P.2d

585].) The isolated statements defendant cites were themselves either admissions or necessary to understand the context of defendant's admissions, and were relevant to show a culpable state of mind. Thus, counsel could reasonably have chosen not to object to the evidence or to the prosecutor's reference to such evidence during argument.

Third, defendant faults defense counsel for failing to object to the prosecutor's comparison of defendant to Nazi leaders Adolf Eichmann (during closing argument at the guilt phase) and Adolf Hitler (during closing argument at the penalty phase). However, the prosecutor's reference to "one of the main executioners at a Nazi concentration camp," without reference to a specific name, was made only to point out that multiple murderers can look like "common, ordinary looking" people, such as defendant. (*People v. Jones* (1997) 15 Cal.4th 119, 180 [61 Cal.Rptr.2d 386, 931 P.2d 960] [prosecutor's references to notorious murderers who committed heinous crimes for irrational purposes but apparently were legally sane was not misconduct], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Nor did the prosecutor refer to Hitler by name or compare defendant to Hitler. He simply noted that the anniversary of the beginning of World War II fell on that day of trial and argued that defendant "waged a war on society and society had to struggle back," as it did during World War II. The prosecutor did not suggest that the offenses charged against defendant were as heinous as those committed by Eichmann or Hitler. (*Jones, supra,* at p. 180.) Counsel was not incompetent for failing to object. (*People v. Harpool* (1984) 155 Cal.App.3d 877, 886 [202 Cal.Rptr. 467] [counsel is not required to make futile objections or motions merely to create a record impregnable to assault for claimed inadequacy of counsel].)

Fourth, defendant claims that, during the penalty phase closing argument, the prosecutor improperly argued that defendant "forfeited his right to sympathy and redemption." Contrary to defendant's argument, the prosecutor did not tell the jury it *could* not consider sympathy, but properly argued that under the facts of the case, defendant does not *deserve* sympathy. "Although a jury is entitled to consider sympathy in its penalty determination—and it would be improper to suggest otherwise [citation]— the jury is not *required* to feel sympathy for murderers. The prosecution may properly argue that the particular facts do not warrant sympathy; the defense may properly argue the opposite." (*People v. Edwards, supra,* 54 Cal.3d at p. 840.) Again, counsel was not incompetent for failing to object.

Finally, contrary to defendant's claim, the three murders were not "close" cases. Rather, the evidence against defendant was overwhelming. Any reasonable jury would have reached the same verdicts in the absence of the

alleged instances of prosecutorial misconduct. (*People v. Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].)

### 5. *Instructional Issues*

#### a. *Duress instruction*

At trial, defendant claimed that he struck Weeden with a rock under duress because he feared that Morris would shoot him if he did not do so. The trial court instructed that "A person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶] 1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged and [¶] 2. If such person then believed that his life was so endangered." (See CALJIC No. 4.40 (5th ed. 1988).) The court also instructed that such threats are not a defense "[w]here a person commits a crime punishable with death" and that "[a] first degree murder with a special circumstance is a crime punishable with death." (See CALJIC No. 4.41 (5th ed. 1988).)

Defendant contends that the limitation in CALJIC No. 4.41 deprived him of a duress defense to the Weeden murder, in violation of the Eighth Amendment and his right to due process. He argues that the multiple-murder special-circumstance allegation permitted classifying the Weeden homicide as a crime punishable by death under section 26 and that, had he been tried separately on that charge before the deaths of Berryhill and Stark, he would have been entitled to a duress defense without limitation. However, duress is not a defense to *any* murder. (*People v. Anderson* (2002) 28 Cal.4th 767, 770, 780 [122 Cal.Rptr.2d 587, 50 P.3d 368].) Because the instructions were unduly *favorable* to defendant, he cannot complain.

Although duress cannot reduce murder to manslaughter by negating malice (*People v. Anderson, supra,* 28 Cal.4th at pp. 770, 781-784), the court nevertheless gave instructions that authorized the jury to consider the effect of threats on the mental states requisite to murder and manslaughter. The jury was told that to establish that a killing is murder, the prosecution had the burden of proving beyond a reasonable doubt that the "act which caused the death was not done . . . in a killing punishable by death, in the honest belief in the necessity to protect oneself against imminent peril to life or great bodily injury, whether or not that belief was reasonable or unreasonable." It was further told that "there is no malice aforethought in a killing punishable by death if the killing occurred in the honest belief in the necessity to protect oneself against imminent peril to life or great bodily

injury, whether or not that belief was reasonable or unreasonable" and that, in such instance, the offense is voluntary or involuntary manslaughter. Again, because the instructions were unduly *favorable* to defendant, he cannot complain.

Although defendant was deprived of the complete defense of duress, he was permitted to use the same underlying facts to mitigate the crime. Thus, in finding defendant guilty of murdering Weeden, the jury necessarily rejected defendant's duress defense. (*People v. Beardslee* (1991) 53 Cal.3d 68, 86-87 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 149 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

b. *Unanimity instruction*

Defendant contends that the trial court was required to instruct sua sponte in the language of CALJIC No. 17.01 that, before finding defendant guilty of the murder of Weeden, the jurors had to agree unanimously on the act or acts that caused her death. He claims that the instruction was mandatory because the evidence reflected that Weeden's death could have resulted from either strangulation or being hit on the head with a rock, or from the combination of both injuries. We reject that claim.

The medical examiner testified that Weeden's death was caused by strangulation, a blow to the head, or a combination of both injuries. Initially, defendant called the Secret Witness program and told Landreth that "Bob" strangled Weeden with a nylon clothesline on a trail and dragged her body to the location where it was found. In a later telephone call to Landreth, defendant repeated that information, but added that she had been hit with a rock to ensure her death. Defendant later told the police that Morris strangled Weeden to death with a rope, that Morris dumped her body in the woods, and that he threw rocks at her body even though she was already dead. Still later, defendant told the police that although Morris strangled Weeden, he forced defendant to strike her on the head with a rock. Defendant was not sure if Weeden was dead when he struck her. The prosecution's theory was that defendant killed Weeden by strangulation or a combination of strangulation and a blow to the head. The defendant's theory was that he did not strangle Weeden, but, under duress, merely struck her with a rock.

A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1025 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Beardslee, supra,*

53 Cal.3d at p. 92.) A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged. (*Beardslee, supra,* at p. 93.) Here, the evidence did not reflect multiple independent acts, any of which could have led to Weeden's death. Rather, the evidence showed that the ligature strangulation contributed, at least in part, to her death. The prosecution contended that defendant committed both acts and that Weeden's death was caused by strangulation or strangulation in combination with the blow to the head. Defendant did not contest that Weeden's death was caused, at least in part, by the strangulation. Instead, he claimed that a man named Morris strangled her and that Morris forced him to throw a rock at her. Thus, the two theories were based on a continuous course of conduct, whose acts were so closely connected in time as to form part of one transaction. (*People v. Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423], disapproved on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365 [121 Cal.Rptr.2d 580, 48 P.3d 1136]; *People v. Dominick* (1986) 182 Cal.App.3d 1174, 1208 [227 Cal.Rptr. 849].)

Defendant argues that a unanimity instruction was necessary because some jurors might have decided that defendant strangled Weeden, while others might have determined that he inflicted a death blow to the head without strangling her. However, even if some of the jurors believed that defendant strangled Weeden, they would have concluded that he was the actual perpetrator. If some jurors believed that defendant only threw a rock at Weeden's head after she was already dead, they would have found no causation. But if some of the jurors believed that defendant only threw a rock at Weeden while she was still alive, while rejecting a duress defense, they would have concluded that he was an aider and abettor. Thus, defendant's conduct as an aider and abettor or as a direct perpetrator could result only in one criminal act and one charge. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1025.) "Under these circumstances, '[j]urors need not unanimously agree on whether the defendant is an aider and abettor or a principal even when different evidence and facts support such conclusion.'" (*Id.* at pp. 1025-1026; see also *People v. Champion* (1995) 9 Cal.4th 879, 931 [39 Cal.Rptr.2d 547, 891 P.2d 93] [two theories that defendant was the actual perpetrator and aider and abettor were based on a single course of conduct]; *People v. Beardslee, supra,* 53 Cal.3d at p. 93 [same].)

 c. *Reasonable but mistaken belief in consent*

 Defendant contends that the trial court erred in failing to instruct, sua sponte, on the defense of reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse (CALJIC No. 10.65;

*People v. Mayberry* (1975) 15 Cal.3d 143, 153-158 [125 Cal.Rptr. 745, 542 P.2d 1337]). Our review of the record shows no substantial evidence to trigger a sua sponte obligation to give such an instruction.

■ "The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*People v. Williams* (1992) 4 Cal.4th 354, 360-361 [14 Cal.Rptr.2d 441, 841 P.2d 961], fn. omitted.)

■ A trial court's duty to instruct, sua sponte, on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Barton* (1995) 12 Cal.4th 186, 195 [47 Cal.Rptr.2d 569, 906 P.2d 531], citing *People v. Sedeno, supra,* 10 Cal.3d at p. 716; *People v. Rhoades* (1987) 193 Cal.App.3d 1362, 1367 [238 Cal.Rptr. 909]; *People v. Romero* (1985) 171 Cal.App.3d 1149, 1156 [215 Cal.Rptr. 634].) Here, defendant concedes that he did not rely at trial on the defense of mistake of fact. Rather, defendant contends that the prosecution's evidence supported such a defense and that the defense was consistent with his theory of the case. We disagree.

The prosecution's evidence showed that Jacqueline H. agreed to accompany defendant only after defendant tricked her by saying that her friend was having a party and offering to take her there. After defendant drove her to a deserted area, Jacqueline H. became scared and asked defendant to take her home. Defendant then placed and tightened a rope around her neck, and demanded that she take off her clothes. Defendant then ordered her to lie down and raped her. A defendant relying on a *Mayberry* defense must produce some evidence of the victim's equivocal conduct that led him reasonably to believe she consented to the act. (*People v. Bruce* (1989) 208 Cal.App.3d 1099, 1104 [256 Cal.Rptr. 647]; *People v. Romero, supra,* 171 Cal.App.3d at p. 1156.) However, here, we see *no* substantial evidence of the victim's "equivocal conduct that would have led a defendant to reasonably

and in good faith believe consent existed where it did not." (*People v. Williams, supra,* 4 Cal.4th at p. 362.)

Moreover, defendant offered *no* evidence showing he believed that Jacqueline H. had consented to sexual intercourse. To warrant a court's giving CALJIC No. 10.65, the record must contain evidence, whether direct or circumstantial, of the defendant's state of mind at the time the offense was committed. (*People v. Simmons* (1989) 213 Cal.App.3d 573, 581 [261 Cal.Rptr. 760]; *People v. Rhoades, supra,* 193 Cal.App.3d at p. 1369.) Defendant did not testify. He presented neither circumstantial evidence of his state of mind at the time of the offense nor evidence that controverted the victim's testimony regarding the circumstances of the offense. Instead, defendant presented only evidence of Jacqueline H.'s dishonest character, drug addiction, and motive to lie. During closing argument, he argued that Jacqueline H. lied about the rape and surrounding events, and suffered from drug-induced paranoia at the time of the offense. Indeed, defendant never admitted that he engaged in sex with Jacqueline H., consensual or otherwise. (See *People v. Gonzalez* (1983) 141 Cal.App.3d 786, 793 [190 Cal.Rptr. 554] [*Mayberry* instruction need not be given sua sponte if defendant does not testify and the "only 'evidence' concerning his belief was his counsel's theory [mistake of fact] in closing argument"].) Thus, an instruction on the defense of reasonable but mistaken belief in consent would have been inconsistent with defendant's theory of the case.

Accordingly, under these circumstances, the trial court had no sua sponte duty to instruct on the *Mayberry* defense. (*People v. Rhoades, supra,* 193 Cal.App.3d at p. 1369 [no sua sponte duty to give *Mayberry* instruction where "[d]efendant's counsel never suggested he was relying on the mistake of fact defense, tendered no evidence to support such a defense, and did not request the instruction defendant now claims it was error to withhold"].)

d. *Reasonableness of fear of immediate and unlawful bodily injury*

■ Defendant claims that the trial court committed reversible error in failing to instruct sua sponte on an "essential element of the rape charge," that Jacqueline H.'s fear of immediate and unlawful bodily injury had to be reasonable.

We rejected a similar claim in *People v. Anderson* (1966) 64 Cal.2d 633 [51 Cal.Rptr. 238, 414 P.2d 366]. There, the defendant argued that the trial court had a sua sponte duty to instruct the jury as to the requisite force or fear as necessary elements of the crime of robbery. We responded as follows: "[Defendant] does not, however, challenge the content of the

robbery instructions given, nor did he request any additional instructions at the trial. [¶] Defendant's contention essentially is that the instructions given needed amplification or explanation; but since he did not request such amplification or explanation, error cannot now be predicated upon the trial court's failure to give them on its own motion." (*Id.* at p. 639.)

Similarly, here, the trial court properly instructed the jury on the general principles of law governing the rape charge. In giving CALJIC No. 10.00 (5th ed. 1988), the trial court instructed on the specific elements of rape, including the requirement that the act of sexual intercourse "was accomplished by means of force, violence, or fear of immediate and unlawful bodily injury."[18] Since the instruction given did not omit or withdraw an element from the jury's determination, defendant was required to request an additional or clarifying instruction if he believed that the instruction was incomplete or needed elaboration. (*People v. Cox* (1991) 53 Cal.3d 618, 669 [280 Cal.Rptr. 692, 809 P.2d 351]; *People v. Bell* (1989) 49 Cal.3d 502, 550 [262 Cal.Rptr. 1, 778 P.2d 129].) This he failed to do.

Moreover, the failure to give a clarifying instruction could not have affected the outcome. Given Jacqueline H.'s testimony that she was alone and "scared to death" when defendant tightened the rope around her neck and forced her to disrobe and lie down, it is inconceivable that the jury would have determined that Jacqueline H.'s fear, before and during the sexual assault, was unreasonable. In addition, the evidence overwhelmingly supported a finding that the rape was accomplished by the other alternative means of force and violence.[19]

e. *Variance between information and rape instruction*

The amended information charged defendant with "FORCIBLE RAPE, in violation of Section 261(2) of the Penal Code, a felony" and alleged that he

---

[18]The trial court read to the jury the fifth edition of CALJIC No. 10.00 (1988), which did not include amplifying language regarding the reasonableness of the victim's fear. CALJIC No. 10.00 (6th ed. 1996) now adds: "[The fear of immediate and unlawful bodily injury must be actual and reasonable under the circumstances [, or if unreasonable, the perpetrator must have known of the victim's fear and taken advantage of it].]"

[19]Defendant argues that the jury could have believed part of her testimony, that she became afraid that defendant was going to kill her during the motorcycle ride to the Happy Valley area, but disbelieved that defendant forced her, with a rope tied around her neck, to submit to sexual intercourse. If so, it could have further determined that the fear of being killed during the motorcycle ride was unreasonable and was the sole reason Jacqueline H. submitted to sexual intercourse. Aside from being speculative, defendant's argument ignores the defense theory of the case at trial. Defense counsel argued that Jacqueline H. may have experienced drug-induced paranoia causing her to "see things different than reality" and think "that she's being raped." Counsel never conceded that an act of sexual intercourse ever took place between defendant and Jacqueline H.

committed the willful and unlawful act of sexual intercourse "by means of force and fear of immediate and unlawful bodily injury." The jury was instructed that it could find defendant guilty of rape by determining that he had accomplished the act of sexual intercourse "by means of force, violence, or fear of immediate and unlawful bodily injury." Defendant claims that his Sixth Amendment right to notice and his right to due process were violated because the jury might have convicted him of an uncharged offense, rape by means of violence. We disagree.

First, defendant has forfeited his right to object to an alleged variance between the pleading and the proof by failing to raise the objection in the trial court. (*People v. Blankenship* (1951) 103 Cal.App.2d 60, 66 [228 P.2d 835], disapproved on other grounds in *People v. Collins* (1960) 54 Cal.2d 57, 60 [4 Cal.Rptr. 158, 351 P.2d 326].)

■ Second, contrary to defendant's assertion, rape by means of violence is *not* a different offense from rape by means of force or fear; these terms merely describe different circumstances under which an act of intercourse may constitute the crime of rape. (See *People v. Collins, supra,* 54 Cal.2d at p. 59.)

Third, defendant has failed to show or even assert that he was prejudiced by the variance. (*People v. Thomas* (1987) 43 Cal.3d 818, 828, 830 [239 Cal.Rptr. 307, 740 P.2d 419].) ■ "The test of the materiality of variance in an information is whether the pleading so fully and correctly informs a defendant of the offense with which he is charged that, taking into account the proof which is introduced against him, he is not misled in making his defense." (*People v. Guerrero* (1943) 22 Cal.2d 183, 187 [137 P.2d 21].) Here, the information charged defendant with forcible rape in violation of former section 261, subdivision (2). That section defined rape in 1987 as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] . . . [¶] [w]here it is accomplished against a person's will by means of force, violence, or fear of immediate and unlawful bodily injury on the person or another." (As amended by Stats. 1986, ch. 1299, § 1, p. 4592.) Thus, defendant was put on notice by the information that he was being charged with an offense that could be accomplished "by means of force, *violence,* or fear of immediate and unlawful bodily injury." Moreover, Jacqueline H.'s testimony at the preliminary hearing gave defendant notice of the particular circumstances of the offense, i.e., that her testimony could support a finding of rape by means of violence, as well as by means of force or fear. (*Thomas, supra,* at pp. 829-830.)

Finally, the variance was not of such a substantial character as to have misled defendant in preparing his defense. (*People v. Collins, supra,* 54

Cal.2d at p. 60.) Here, in finding defendant guilty of rape, the jury found Jacqueline H.'s testimony credible. That evidence equally supported findings of rape by means of force, violence, or fear. It is inconceivable that the jury would have found defendant guilty of rape by means of violence, but not by means of force or fear. Under these circumstances, the variance was immaterial.

### f. Reasonable doubt issues

Without objection, the trial court gave the standard instructions on (1) circumstantial evidence (CALJIC Nos. 2.01 [sufficiency of circumstantial evidence-generally], 2.02 [sufficiency of circumstantial evidence to prove specific intent], 8.83 [sufficiency of circumstantial evidence to prove the special circumstance], and 8.83.1 [sufficiency of circumstantial evidence to prove mental state]); (2) the credibility and weight of the evidence (CALJIC Nos. 2.21.2 [witness willfully false] and 2.22 [weighing conflicting testimony]); and (3) the definition of reasonable doubt (CALJIC No. 2.90). Defendant claims that those instructions given, singly and collectively, impermissibly diluted the reasonable doubt standard.

■■■ Regarding the instructions on circumstantial evidence, we have repeatedly rejected defendant's argument. Those instructions, which refer to an interpretation of the evidence that "appears to you to be reasonable" and are read in conjunction with other instructions, do not dilute the prosecution's burden of proof beyond a reasonable doubt. (*People v. Hughes, supra,* 27 Cal.4th at pp. 346-347; *People v. Osband, supra,* 13 Cal.4th at pp. 678-679; *People v. Ray, supra,* 13 Cal.4th at pp. 347-348.)

■■■ Regarding CALJIC No. 2.21.2, defendant argues that it lowers the standard of proof for conviction by permitting the jury to assess the testimony of prosecution witnesses under a "probability of truth" standard.[20] We have rejected a similar claim that the instruction, as applied to the defendant's testimony, increases the burden of proof from raising a reasonable doubt to meeting a "probability of truth." (*People v. Beardslee, supra,* 53 Cal.3d at p. 94.) "The qualification attacked by defendant as shifting the burden of proof ('unless from all the evidence you shall believe the probability of truth favors his testimony in other particulars') is merely a statement of the obvious—that the jury should refrain from rejecting the whole of a witness's testimony if it believes that the probability of truth

---

[20]CALJIC No. 2.21.2 provides: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

favors any part of it. [¶] 'Thus CALJIC No. 2.21 does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute.' " (*Beardslee, supra,* at p. 95.) Although defendant here attacks the instruction as applied to prosecution witnesses, the same rationale applies. (*People v. Brown* (1996) 42 Cal.App.4th 1493, 1502-1503 [50 Cal.Rptr.2d 407]; *People v. Wade* (1995) 39 Cal.App.4th 1487, 1493-1494 [46 Cal.Rptr.2d 645]; *People v. Foster* (1995) 34 Cal.App.4th 766, 772-776 [40 Cal.Rptr.2d 633].) When CALJIC No. 2.21.2 is considered in context with CALJIC Nos. 1.01 (consider instructions as a whole) and 2.90 (burden of proof), "the jury was adequately told to apply CALJIC No. 2.21.2 'only as part of the process of determining whether the prosecution had met its fundamental burden of proving [defendant's] guilt beyond a reasonable doubt.' [Citation.]" (*Foster, supra,* at p. 775.)

Regarding CALJIC No. 2.22, defendant argues that it impermissibly dilutes the reasonable doubt standard because it allows the jury to resolve conflicting testimony by weighing "the convincing force of the evidence."[21] Again, when this instruction is considered with CALJIC Nos. 1.01 and 2.90, " '[I]t is apparent that the jury was instructed to weigh the relative convincing force of the evidence (CALJIC No. 2.22) only as part of the process of determining whether the prosecution had met its fundamental burden of proving [defendant's] guilt beyond a reasonable doubt . . . .' " (*People v. Clay* (1984) 153 Cal.App.3d 433, 461-462 [200 Cal.Rptr. 269]; *People v. Salas* (1975) 51 Cal.App.3d 151, 157 [123 Cal.Rptr. 903].)

Finally, with respect to former CALJIC No. 2.90, we have repeatedly held that the phrases "depending on moral evidence" and "to a moral certainty" correctly define reasonable doubt. (*People v. Turner* (1994) 8 Cal.4th 137, 203 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People v. Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009].) Because the instruction, individually, correctly defines reasonable doubt, we reject defendant's claim that this instruction, when considered together with the other complained-of instructions, was improper. (*People v. Osband, supra,* 13 Cal.4th at pp. 678-679.)

---

[21]CALJIC No. 2.22 provides: "You are not bound to decide an issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force. You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other. You must not decide an issue by the simple process of counting the number of witnesses [who have testified on the opposing sides]. The final test is not in the [relative] number of witnesses, but in the convincing force of the evidence."

### g. *Alleged Carlos error*

In *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we incorrectly held that intent to kill was a necessary element of the felony-murder special circumstance, and in *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], we extended the *Carlos* holding to the multiple-murder special circumstance. In *People v. Anderson* (1987) 43 .Cal.3d 1104, 1149 [240 Cal.Rptr. 585, 742 P.2d 1306], we overruled both *Carlos* and *Turner*, dispensing with the requirement of an intent to kill by the actual killer. Because the murders here occurred during the "window period" between *Turner* and *Anderson*, the intent to kill requirement of *Turner* applies to the multiple-murder special circumstance charged in connection with those murders. (*People v. Johnson* (1993) 6 Cal.4th 1, 45 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

In accordance with *Turner*, the trial court instructed on the multiple-murder special-circumstance allegation as follows:

"To find the special circumstance, referred to in these instructions as multiple murder convictions, is true, it must be proved:

"1. The defendant has in this case been convicted of at least one crime of murder of the first degree and one or more crimes of murder of the first or second degree.

"2. That the defendant *intended to kill a human being or intended to aid another in the killing of a human being* in one first degree murder of which you have found him guilty and in at least one other murder of which you have found him guilty." (Italics added; see CALJIC No. 8.81.3.)

Regarding the above instruction, defendant does not claim that the trial court incorrectly instructed on the intent requirement for the actual killer. Rather, he contends that the court erroneously instructed on the intent requirement with respect to aider-and-abettor liability. He argues that the instruction did not necessarily require the jury to find that the aider and abettor intended to kill, because one may intend to aid another who happens to kill someone but not intend to kill that person. However, based on the instructions given and the evidence presented, we conclude that, if the jury predicated murder liability on an aiding and abetting theory, it necessarily found that defendant intended to kill.

Of all three murders, the evidence supported an aiding and abetting theory only on the Weeden murder count. That evidence consisted solely of defendant's extrajudicial statements to the police that he happened to come upon

Morris as he was strangling Weeden. Initially, defendant stated that he believed Weeden was dead after Morris strangled and dropped her, but later stated that he was not sure if she was dead at that time. He also related that Morris forced him at gunpoint to strike Weeden on the head with a rock so no one would know how she died.

On the remaining murder counts, there was no evidence that defendant aided and abetted another in the killings of Berryhill or Stark. Based on the evidence, the jury could only find defendant guilty of murder as the actual killer of those victims. Yet the jury was properly instructed that the actual killer must have *intended to kill a human being* as an element of the multiple-murder special circumstance. Thus, if the jury predicated its multiple-murder special-circumstance finding on the Berryhill or Stark murder conviction, it was correctly instructed that intent to kill was an element. Indeed, as defendant concedes, the jury expressly found that the first degree murder of Berryhill was "perpetrated by a wilful, deliberate, and premeditated killing" and thus necessarily determined that defendant intended to kill Berryhill. Because the multiple-murder special-circumstance finding required the jury to have found at least two intentional killings and we are not sure which two murder convictions the jury used to support that finding, we examine whether the jury could have determined that defendant intended to aid and abet Morris in the killing of Weeden without intending to kill her, as defendant asserts.

The jury was instructed, in the language of CALJIC No. 3.00, that "The persons concerned in the commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime." The trial court further instructed, in the language of CALJIC No. 3.01, that "A person aids and abets the commission of a crime when he (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime." The challenged instruction told the jury that a multiple-murder special-circumstance finding required that defendant "intended to kill a human being *or* intended to aid another in the killing of a human being." But in the context of all of the instructions given, the jury was also told that to find aider and abettor liability, it must find both that defendant intended to commit the "aiding" act of killing Weeden and that he did so with knowledge of the perpetrator's criminal purpose, i.e., to kill her. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1242 [249 Cal.Rptr. 71, 756 P.2d 795].)

Moreover, there was no evidence to support a finding that defendant aided Morris in killing Weeden without knowing that Morris intended to kill her.

According to defendant's story to the police, Morris forced defendant to strike Weeden on the head with a rock to mask the cause of death. Thus, if the jury believed defendant and found that he intentionally aided and abetted the actual killer, as required by the challenged instruction, it necessarily found, under the instructions and evidence given, that he knew he was aiding in an intentional killing. The jury could not have found that defendant "aided" the killing only accidentally or unintentionally. (*People v. Hardy* (1992) 2 Cal.4th 86, 192-193 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Garrison* (1989) 47 Cal.3d 746, 790-791 [254 Cal.Rptr. 257, 765 P.2d 419].) On the other hand, if the jury found defendant was the actual killer of Weeden, it was properly instructed on intent to kill. Under the circumstances of this case, we conclude that the jury necessarily found defendant intended to kill in at least two of the murders. (*People v. Marshall* (1996) 13 Cal.4th 799, 852 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *Hardy, supra,* at pp. 192-193.)

Even if error had occurred, it was harmless. (*People v. Johnson, supra,* 6 Cal.4th at pp. 44-46.) Given defendant's admissions, his many inconsistent statements, and his attempts to capitalize financially from the killings, overwhelming evidence existed of his intent to kill all his victims.

### D. *Penalty Phase Issues*

#### 1. *Admissibility of Polygraph Evidence*

■ Defendant claims that the trial court's refusal to admit evidence of the polygraph result regarding Weeden's death violated his right, under the Eighth and Fourteenth Amendments, to have relevant mitigating evidence presented to the jury.

At trial, defendant argued that evidence that he "passed" the polygraph test regarding Weeden's death was admissible as a factor in mitigation and to establish lingering doubt. The trial court denied the request to admit the evidence, relying on Evidence Code sections 351.1 and 352. It found that any "possible probative value" of the polygraph evidence was outweighed by its "doubtful reliability" and the fact that its admission would be "potentially cumbersome and time-consuming."

The Attorney General argues that "the unambiguous language of Evidence Code section 351.1, subdivision (a), prohibits the admission of the polygraph results in the present case." He asserts that *United States v. Scheffer, supra,* 523 U.S. at pages 309-316 [118 S.Ct. at pages 1264-1268], disposes of defendant's claim. Relying on *Paxton v. Ward* (10th Cir. 1999) 199 F.3d

1197, defendant responds that a state court's rule of evidence may not be mechanically applied to infringe on a defendant's rights under the Eighth and Fourteenth Amendments to present mitigating evidence in a capital case. (*Paxton, supra,* at p. 1214; but cf. *Goins v. Angelone* (4th Cir. 2000) 226 F.3d 312, 326, fn. 7 [" '[U]nder current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings' "].) *Paxton* ruled that *Scheffer* is distinguishable because it did not involve a capital defendant's constitutional right to present mitigating evidence. (*Paxton, supra,* at p. 1215.) Unlike *Paxton,* here the trial court did not deny admission of the polygraph results based on a mechanical application of Evidence Code section 351.1. Rather, the court exercised its discretion under Evidence Code section 352, finding that any "possible probative value" of the polygraph evidence was outweighed by its "doubtful reliability."

If Evidence Code section 351.1 permits a defendant to make a *Kelly/Frye* showing (see *ante,* at p. 414), as in the guilt phase, defendant failed to present an offer of proof that polygraph evidence was generally accepted in the scientific community. Because such an offer of proof is necessary to preserve the issue for appeal, defendant cannot assign error in the trial court's ruling. (*People v. Fudge, supra,* 7 Cal.4th at p. 1122; see also *People v. Burgener* (2003) 29 Cal.4th 833, 870 [129 Cal.Rptr.2d 747, 62 P.3d 1].) Without the threshold showing of reliability, polygraph evidence is not "highly relevant" to the question of proper punishment. (*Fudge, supra,* at pp. 1122-1123 [polygraph evidence was not "highly relevant" mitigating evidence demonstrating good character or supporting a lingering doubt of guilt].) In addition, defendant failed to show that the particular polygraph test results being proffered were reliable. Unlike this case, in *Paxton,* the reliability of the excluded polygraph evidence in that individual case was demonstrated by the fact that the state relied on it in dismissing an earlier charge against defendant. (*Paxton v. Ward, supra,* 199 F.3d at p. 1214.)

Defendant claims that the polygraph evidence was relevant mitigating evidence on the issue of relative culpability. He argues that some jurors, at the guilt phase, could have based their first degree murder verdict on the finding that defendant did not kill Weeden, but only aided and abetted Morris in the commission of felony robbery during which Weeden was killed. Thus, he argues, the polygraph test results showing that defendant did not kill Weeden would support his lack of culpability. However, there was no evidence that defendant aided and abetted Morris in the commission of a robbery, but only evidence that he aided and abetted Morris in the commission of murder, i.e., defendant's extrajudicial statement that Morris forced him to throw a rock at Weeden. Although there was evidence that Morris

took Weeden's truck, there was no substantial evidence that Weeden's killing was committed to take her truck. Thus, exclusion of the polygraph test results was not "highly relevant" to the question of proper punishment.

### 2. *Denial of Mistrial Motion*

██ Defendant contends that the trial court abused its discretion in failing to grant his motion for a mistrial after the jury foreman was replaced with an alternate juror during the penalty phase. On appeal, we review the trial court's denial of a motion for mistrial under the deferential abuse of discretion standard. (*People v. Mayfield* (1997) 14 Cal.4th 668, 756 [60 Cal.Rptr.2d 1, 928 P.2d 485].) ██ The decision whether to investigate possible juror bias, incompetence, or misconduct, as well as the ultimate decision whether to retain or discharge a juror, rests within the sound discretion of the trial court. (*People v. Bradford, ·supra,* 15 Cal.4th at p. 1351.) If any substantial evidence exists to support the trial court's exercise of its discretion, the court's action will be upheld on appeal. (*Ibid.*) ██ Here, the trial court did not abuse its discretion.

On Thursday afternoon, August 24, 1989, the jury returned its guilt phase verdicts and special circumstance findings. On the following day, the jury foreman, Jimmie K., informed the clerk that he had concerns about the trial. On Tuesday, August 29, the trial court questioned Jimmie K. about his concerns. The foreman related that after the proceedings had been adjourned on Thursday afternoon following the guilt phase verdicts, he overheard a female bartender telling someone that she knew defendant. When Jimmie K. asked how she knew defendant, the bartender responded that defendant had choked and attempted to rape her in 1984 or 1985. The trial court granted defendant's challenge of the foreman. Jimmie K. then informed the court that another juror, Annette S., was present during part of his conversation with the bartender. Because he left without discussing the conversation with Annette S., he did not know if she overheard it. Jimmie K. assured the court that he had not discussed the bartender incident with any of the other jurors, including Juror Annette S.

On Wednesday, August 30, 1989, defendant moved for a mistrial on the penalty phase, which the trial court denied. Later that day, the court examined Juror Annette S. The juror informed the court that she overheard the bartender say that she had a "run-in" with defendant and that "he was supposed to have choked her." When asked how that discussion affected her, Annette S. replied, "I don't know. You can't believe everything you hear." Defendant challenged Annette S. The prosecutor opposed the challenge and proposed that the court inform her that the prosecution investigated what the

bartender had related and determined it was not true. When the juror returned to the courtroom, the court told Annette S. that the prosecution determined that defendant was not the person that the bartender had been talking about. Annette S. assured the court that she accepted the fact that defendant had not been involved in that incident and could disregard the information she overheard. The court admonished Annette S. not to discuss the bartender incident with any of the other jurors.

On the following day, the trial court deferred ruling on the defense challenge of Annette S. After the parties had rested, but before the penalty phase deliberations, the defense renewed the challenge to Annette S. The court granted the motion and replaced Annette S. with an alternate juror.

Defendant now argues that the trial court should have granted a mistrial because Jurors Jimmie K. and Annette S. might have spoken to the other jurors about the bartender's statement that defendant choked and attempted to rape her. Defendant argues that Jimmie K. told the court that he had discussed "this matter" in superficial ways with the other jurors and that "this matter" was a reference to the bartender's statement.[22] The People respond that defendant misreads the record and point out that, after the guilt phase verdict, the trial court adjourned the proceedings and the jury did not return to court for the penalty phase until Thursday, August 31, 1989. Because the bartender's remark occurred after the guilt phase verdicts and adjournment and the jury did not return to court until after the court had questioned Jimmie K. on August 29, the juror's reference to *this matter* must have been to the guilt phase portion of trial, which had just been completed before the jurors' separation on August 24. For the same reasons, the People state that Juror Annette S. could not have spoken to the other jurors about the outside information because the court questioned her on August 30, a day before the jury returned to court.

In his reply brief, defendant concedes that the People's chronology is correct and that the evidence reflects that the two jurors could not have related the bartender's statements to the other jurors in the courthouse. Nevertheless, he maintains that the trial court's failure to ask Annette S. if she had already spoken to other jurors about the outside information and to

---

[22]Defendant relies on the juror's response during the following exchange:

"[DEFENSE COUNSEL]: Q. Mr. [K.], did you find occasion to discuss this case with any other juror prior to the deliberations?

"A. No, sir.

"Q. And how about after the verdict, did you discuss *this matter* with any juror after the verdict?

"A. No, sir. In other than superficial ways, no; going down the stairs, because we all separated there." (Italics added.)

make similar inquiries of the remaining jurors was prejudicial error. He argues that since Jimmie K. and Annette S. socialized at the bar, they may have socialized and spoken with the other jurors outside of court about the incident. In light of the record, this argument is speculative.

Second, defendant complains that, because the 10 remaining original jurors had already found him guilty of the charges beyond a reasonable doubt and were so "entrenched" in their views of guilt, the two replacement jurors could not freely deliberate and express opposing views of the evidence. We fail to see how that argument supports his claim that the substitution of two jurors denied him a fair and impartial jury. Indeed, if his premise is true, that the 10 guilt phase jurors could not fairly and impartially deliberate as to the appropriate penalty, defendant would be better off with two replacement jurors who were not so "entrenched" in their views.

Third, defendant contends that the 10 remaining original jurors, who had found defendant guilty of the charged offenses, could not possibly have disregarded past guilt phase deliberations and begun deliberations anew as related to the issue of lingering doubt. In light of the instructions given, that argument is simply speculative. Because deliberations on the guilt phase of trial were complete and verdicts of guilt had been returned, the jury was instructed that "you are not required to again render verdicts as to the guilt or innocence of the defendant nor truth of the special allegations. Those verdicts have already been rendered in the guilt portion of the trial." However, as to the deliberations relevant in determining penalty, the jury was instructed that "The People and the defendant have the right to a verdict reached only after full participation of the 12 jurors who return the verdict. This right may be assured only if you begin your deliberations again from the beginning. You must, therefore, set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place." The jurors were further told that they were to consider the "circumstances of the crimes of which defendant was convicted" and "all of the evidence which has been received during any part of the trial." As to lingering doubt, the jurors were instructed that "[t]o the extent that you have any lingering or residual doubts as to the defendant's guilt of the crimes of which he has been convicted in this case, or the existence of any circumstances found to be true in this case, you may consider such lingering or residual doubts as the basis for determining that life imprisonment without possibility of parole is the appropriate penalty."

Thus, "the instructions made clear not only that lingering doubts as to guilt could be considered in mitigation, but also that the penalty phase jury

was to deliberate on this question as an integrated whole, to set aside any previous discussion on the question, and to review in its common deliberations any relevant guilt phase evidence." (*People v. Cain* (1995) 10 Cal.4th 1, 67 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) In other contexts, we have rejected defendant's underlying premise that jurors, who had previously returned guilty verdicts in the guilt phase of trial, could no longer be impartial. (See *People v. Bradford, supra,* 15 Cal.4th at pp. 1354-1355; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1029 [248 Cal.Rptr. 568, 755 P.2d 1017].) If we were to accept defendant's argument, substitution of jurors at the penalty phase could never occur under any circumstances, resulting in automatic mistrials. We decline to do so because, as in this case, "unforeseen circumstances may require substitution of a juror at the penalty phase of a capital trial, even though the alternate did not take part in the guilt phase deliberations." (*People v. Fields* (1983) 35 Cal.3d 329, 351, fn. 9 [197 Cal.Rptr. 803, 673 P.2d 680].)

Accordingly, defendant has failed to show that the trial court abused its discretion in denying his motion for a mistrial.

### 3. *Factor (a) Instruction*

 Defendant claims the trial court erred in instructing the penalty phase jury that before considering section 190.3, factor (a) (circumstances of the crime), as a circumstance in aggravation, each "juror must be *satisfied* beyond a reasonable doubt that the defendant, *in fact*, committed such charged crime or crimes." (Italics added.) He argues the instruction precluded full participation in penalty deliberations by any substitute juror who did not participate in the guilt verdict because that juror might have had a doubt about defendant's guilt. The claim fails.

The trial instructions specifically directed each juror to "decide the matter for yourself after a careful discussion of the evidence and the instructions with the other members of the jury." The jury was also informed that "[t]he People and the defendant have the right to a verdict reached only after *full participation of the 12 jurors who return the verdict.*" (Italics added.) Viewed as a whole, there is no reasonable likelihood the jury misconstrued or misapplied the instructions, and therefore no federal constitutional violation occurred. (See *People v. Barnett, supra,* 17 Cal.4th at p. 1161; *People v. Samayoa* (1997) 15 Cal.4th 795, 833 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People v. Avena* (1996) 13 Cal.4th 394, 417 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

Even assuming error, prejudice to defendant is not identified, or apparent, from an instruction that would allow a substitute juror to believe he or she

was not bound by the jury's guilt verdict in determining the ultimate penalty. The jury in this case unanimously returned a verdict in favor of death. It is unimaginable that a penalty phase juror who entertained a reasonable doubt about a defendant's guilt would favor death over life imprisonment, or that the challenged instruction could somehow have increased the likelihood of a death verdict. Under any standard of harmless error, no prejudice is discernable.

### 4. District Attorney's Discretion to Charge Capital Punishment

Defendant contends the judgment should be reversed because the district attorney improperly exercised his discretion to seek the death penalty against defendant for reasons contaminated by bias and conflict of interest arising from the district attorney's personal and emotional involvement in the case, and "motivated purely by his own self-interest." The available remedy, which defendant did not seek below, is provided under section 1424, governing motions to disqualify the prosecuting attorney for conflict of interest or other evidence of overriding bias. (See *People v. Millwee* (1998) 18 Cal.4th 96, 123 [74 Cal.Rptr.2d 418, 954 P.2d 990].)[23] Defendant's failure to move to disqualify the district attorney in the trial court bars appellate review of the claim.

We also observe that the district attorney has broad prosecutorial discretion in deciding whether to seek the death penalty. (*People v. Steele* (2002) 27 Cal.4th 1230, 1269 [120 Cal.Rptr.2d 432, 47 P.3d 225]; *People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Absent proof of invidious discrimination (see *People v. Pinholster* (1992) 1 Cal.4th 865, 971 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 300 [124 Cal.Rptr. 204, 540 P.2d 44]) or vindictive prosecution because of a defendant's exercise of his legal rights (*In re Bower* (1985) 38 Cal.3d 865, 874-877 [215 Cal.Rptr. 267, 700 P.2d 1269]), neither of which defendant alleges in this case, "as a general matter a defendant who has been duly convicted of a capital crime under a constitutional death penalty statute may not be heard to complain on appeal of the prosecutor's exercise of discretion in charging him with special circumstances and seeking the death penalty." (*People v. Lucas* (1995 ) 12 Cal.4th 415, 477 [48

[23]Section 1424 provides that a motion to disqualify a district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." Section 1424 establishes "a two-part test: (i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting? Thus, while a 'conflict' exists whenever there is a 'reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner,' the conflict is disabling only if it is 'so grave as to render it unlikely that defendant will receive fair treatment.' [Citation.]" (*People v. Eubanks* (1996) 14 Cal.4th 580, 594 [59 Cal.Rptr.2d 200, 927 P.2d 310], fn. omitted; see also *People v. Millwee, supra,* 18 Cal.4th at p. 123.)

Cal.Rptr.2d 525, 907 P.2d 373].) "[T]o the extent defendant is claiming a violation of due process in the charging decision, defendant did not make a motion to dismiss or to strike the special circumstances on this basis, and should not be permitted to raise the matter for the first time here. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 827 [claim of vindictive prosecution not preserved for appeal unless it was a basis for motion to dismiss in trial court].)" (*Lucas, supra,* at p. 477.)

### 5. *Constitutionality of the Death Penalty*

Defendant challenges the sentencing scheme under California's 1978 death penalty law for reasons previously rejected by this court in other cases. He raises no basis for reconsideration of those rulings.

Specifically, a jury's finding of aggravation based on the circumstances of a crime under section 190.3, factor (a), does not impermissibly permit consideration of a factor that is vague and overbroad, or allow guilt phase crimes to be counted more than once as aggravating factors, thereby unfairly weighting sentencing deliberations in favor of death. (*People v. Hughes, supra,* 27 Cal.4th at pp. 404-405; *People v. Barnett, supra,* 17 Cal.4th at p. 1179; *People v. Crittenden, supra,* 9 Cal.4th at p. 156.) In itself, introduction of evidence of unadjudicated criminal activity under section 190.3, factor (b), does not offend the federal Constitution. (*People v. Samayoa, supra,* 15 Cal.4th at p. 863; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 478 [24 Cal.Rptr.2d 808, 862 P.2d 808].) Application of the words "extreme" and "substantial" in section 190.3, factors (d) and (g), does not impermissibly limit consideration of mitigating factors in violation of the federal Constitution. (*People v. Barnett, supra,* 17 Cal.4th at pp. 1178-1179; *People v. Williams* (1997) 16 Cal.4th 153, 276 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Scott, supra,* 15 Cal.4th at pp. 1227-1228.) Because the jury was instructed on miscellaneous sympathy evidence under section 190.3, factor (k), "[t]he temporal language in section 190.3, factors (d) and (h) (consideration of any extreme mental or emotional disturbance or impairment from mental disease or defect or the effects of intoxication *at the time of the offense*), [does] not preclude the jury from considering any such evidence merely because it did not relate specifically to defendant's culpability for the crimes committed." (*People v. Hughes, supra,* 27 Cal.4th at p. 405, fn. 33.)

Even when requested, there is no error in the trial court's failure to delete as inapplicable mitigating factors (e) (whether victim participated in crime) and (f) (moral justification for crime) of section 190.3 from the standard statutory instructions, if the jury, as in this case, was properly instructed to consider and be guided by all the factors " 'if applicable,' " since "we

assume the jury properly followed the instruction and concluded that mitigating factors not supported by evidence were simply not 'applicable.' " (*People v. Sanchez* (1995) 12 Cal.4th 1, 79 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; see also *People v. Frye* (1998) 18 Cal.4th 894, 1027 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Turner, supra,* 8 Cal.4th at pp. 207-208.)[24] No rule of constitutional law requires that aggravating factors must be proved beyond a reasonable doubt or that aggravating factors must outweigh mitigating factors beyond a reasonable doubt. (*People v. Koontz, supra,* 27 Cal.4th at p. 1095; *People v. Barnett, supra,* 17 Cal.4th at p. 1178; *People v. Holt* (1997) 15 Cal.4th 619, 684 [63 Cal.Rptr.2d 782, 937 P.2d 213].) The burden of proof for mitigating and aggravating factors need not be specified, except for "other crimes" evidence. (*People v. Carpenter* (1997) 15 Cal.4th 312, 417-418 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Samayoa, supra,* 15 Cal.4th at pp. 852-853, 862.) Sentencing instructions are not unduly vague because they fail to identify which factors are aggravating and which are mitigating, or to explain to the jury how to treat any inapplicable factors. (*People v. Turner, supra,* 8 Cal.4th at pp. 207-208.) Because the appropriate penalty is not presumed and is a question for each individual juror, no presumption exists in favor of life or death in determining penalty in a capital case. (*Samayoa, supra,* at pp. 852-853; see also *Holt, supra,* at p. 684 ["capital sentencing is a moral and normative process"].)[25]

The trial court is not required to give an instruction that the meaning of "life without possibility of parole" actually means life in prison without possibility of parole, since such an instruction would be inaccurate. (*People v. Arias, supra,* 13 Cal.4th at pp. 172-173; see also *People v. Earp* (1999) 20 Cal.4th 826, 903 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Jones, supra,* 15 Cal.4th at pp. 189-190.) Jury unanimity is not required on aggravating circumstances, which are not elements of an offense. (*People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Pride* (1992) 3 Cal.4th 195, 268 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 147 [2 Cal.Rptr.2d 335, 820 P.2d 559], judg. vacated and cause remanded (1992) 506 U.S. 802 [113 S.Ct. 32, 121 L.Ed.2d 5].) Written findings and reasons for the jury's death verdict are not constitutionally required. (*People v. Hughes, supra,* 27 Cal.4th at p. 405; *People v. Kraft, supra,* 23 Cal.4th at p. 1078; *People v. Turner, supra,* 8 Cal.4th at p. 209; *People v. Frierson* (1979) 25 Cal.3d 142, 178-180 [158 Cal.Rptr. 281, 599 P.2d 587].) Finally, defendant's claim that this court's

---

[24]Defendant appears to characterize factors (e) and (f) of section 190.3 as potentially applicable in aggravation. Those factors, however, have been consistently and correctly viewed only as mitigating. (See *People v. Marshall, supra,* 13 Cal.4th at pp. 856-857.)

[25]Nothing in *Ring v. Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556] alters our analysis. (See *People v. Prieto* (2003) 30 Cal.4th 226, 262-263 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

appellate review process is impermissibly influenced by political considerations is rejected for the reasons explained in recent cases addressing the same claim. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1140-1141 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Hughes, supra,* 27 Cal.4th at p. 406.)

### 6. *Disproportionate Punishment*

Defendant asserts that his death judgment for murdering three people should be set aside because it is disproportionate to his personal culpability. The claim rests in part on the contention that he murdered his victims because the government provided him with reward money for turning in their bodies, thereby effectively making the government the instigator. He also relies on the mitigating evidence presented to the jury during the penalty phase relating to his family background, mental condition, and marijuana abuse. ▉ Although we decline to conduct an intercase proportionality review (*People v. Frye, supra,* 18 Cal.4th at p. 1029; *People v. Mincey* (1992) 2 Cal.4th 408, 476 [6 Cal.Rptr.2d 822, 827 P.2d 388]), we do undertake an intracase review to determine whether the penalty is disproportionate to defendant's personal culpability.

That process requires us to "examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, stated another way, that the punishment ' " " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Hines* (1997) 15 Cal.4th 997, 1078 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Even assuming the validity of defendant's contention that the government bears responsibility for what he did because it enabled him to make money murdering people (a contention we find dubious), intracase proportionality review examines " ' "whether [a] *defendant's* death sentence is proportionate to *his* individual culpability, irrespective of the punishment imposed on others." [Citation.]' " (*People v. Padilla* (1995) 11 Cal.4th 891, 961 [47 Cal.Rptr.2d 426, 906 P.2d 388], overruled on other grounds in *People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1; *People v. Hill* (1992) 3 Cal.4th 959, 1014 [13 Cal.Rptr.2d 475, 839 P.2d 984], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) The guilt or culpability of codefendants or third parties does

not affect that analysis. (*Hill, supra,* at p. 1014; see also *People v. Riel, supra,* 22 Cal.4th at p. 1223; *People v. Mincey, supra,* 2 Cal.4th at p. 476.)

Here, defendant's sentence is not disproportionate to his personal culpability, even if he was not the most heinous murderer or his crime the most abominable. (See *People v. Hughes, supra,* 27 Cal.4th at p. 406; *People v. Padilla, supra,* 11 Cal.4th at p. 962; *People v. Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676].) Defendant brutally murdered three people, in part, to collect money. On this record, the sentence of death is not disproportionate to defendant's personal responsibility and moral guilt. (See *Marshall, supra,* at p. 938.)

### 7. Effect of Delay Between Sentence and Execution; Constitutionality of Lethal Injection

Defendant argues that his sentence must be vacated because of (1) unconstitutional delay in the length of time his automatic appeal has been pending, and (2) the method used in carrying out the death sentence (lethal injection). These claims have been raised and rejected in other capital cases. (*People v. Koontz, supra,* 27 Cal.4th at p. 1096; *People v. Ochoa* (2001) 26 Cal.4th 398, 462-463 [110 Cal.Rptr.2d 324, 28 P.3d 78].) No reason appears for revisiting those decisions.

### 8. Other Challenges to Penalty Phase Instructions

Defendant claims error in the trial court's failure to instruct the jury sua sponte on the beyond-a-reasonable-doubt standard[26] for "other crimes" that were not directly alleged under section 190.3, factor (b), but implicitly raised as aggravating circumstances by the prosecution. Defendant points to the prosecution's closing argument asking the jury to base its penalty decision on the evidence presented *in both the guilt and the penalty phases.* The prosecution also characterized defendant as a serial killer and inferentially referred to Adolf Hitler and Adolf Eichmann. Defendant contends that the

---

[26]CALJIC No. 8.87, which defendant asserts should have been given, instructs the jury as follow: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal [act[s]] [activity]: []which involved [the express or implied use of force or violence] [or] [the threat of force or violence]. Before a juror may consider any criminal [act[s]] [activity] as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant [] did in fact commit such criminal [act[s]] [activity]. A juror may not consider any evidence of any other criminal [act[s]] [activity] as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that the criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

result may have been that the jury considered section 190.3, factor (b), aggravation from defendant's various statements, reported in the guilt phase, suggesting he committed more than the three killings for which he was charged and convicted.

The claim fails. First, in the absence of a request, the trial court is under no duty to give an instruction at the penalty phase regarding evidence received at the guilt phase. (*People v. Anderson* (2001) 25 Cal.4th 543, 588 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Lang* (1989) 49 Cal.3d 991, 1039 [264 Cal.Rptr. 386, 782 P.2d 627].) Even when section 190.3, factor (b), criminal activity is expressly alleged, which was not the case here, "the rule absolving the court of a sua sponte duty to instruct on the elements of crimes introduced under [section 190.3,] factor (b) ' "is based in part on a recognition that, as [a] tactical matter, the defendant 'may not want the penalty phase instructions . . . [to] lead the jury to place undue emphasis on the crimes rather than on the central question of whether he should live or die.' [Citations.]" ' " (*Anderson, supra,* at p. 588.) If a trial court need not instruct a jury sua sponte as to the elements of alleged other crimes, given the possible undue emphasis which the defense may fear the jury will place on them (*People v. Hawkins, supra,* 10 Cal.4th at pp. 963-964), a trial court is obviously under no sua sponte obligation to instruct the jury on the prosecution's burden of proving other crimes that are not clearly introduced under section 190.3, factor (b). (See *People v. Lang, supra,* 49 Cal.3d at p. 1040; *People v. Rich* (1988) 45 Cal.3d 1036, 1121-1122 [248 Cal.Rptr. 510, 755 P.2d 960]; *People v. Poggi* (1988) 45 Cal.3d 306, 341 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People v. Williams* (1988) 44 Cal.3d 1127, 1147 [245 Cal.Rptr. 635, 751 P.2d 901].)

Second, even assuming the prosecution's closing argument could be deemed to invite jury consideration of unalleged "other crimes" evidence, something we do not accept, the jury was expressly directed under CALJIC No. 8.86, relating to defendant's prior felony conviction for receiving stolen property, that it "may not consider any evidence of any other crime as an aggravating circumstance except as otherwise provided in these instructions." In assessing the instruction to determine whether the jury was adequately guided under the Eighth or Fourteenth Amendment, we look to whether it is reasonably likely the jury understood the instruction and correctly applied it. (See *People v. Barnett, supra,* 17 Cal.4th at p. 1161.) In doing so, we conclude there was no reasonable likelihood the jury considered or relied on "other crimes" evidence, which it was expressly told not to consider unless directed otherwise.

Defendant also contends that the failure to label each factor as either aggravating or mitigating rendered the factors unconstitutionally vague because the jury was left without guidance about their meaning and application, allowing the jury to consider in aggravation such factors as intoxication

and mental impairment, which may be considered only in mitigation. The claim does not survive the United States Supreme Court ruling in *Tuilaepa v. California* (1994) 512 U.S. 967, 975-979 [114 S.Ct. 2630, 2636-2639, 129 L.Ed.2d 750], upholding section 190.3, factors (a), (b), and (i), against a challenge that the factors were unconstitutionally vague because the sentencer was not instructed on how to weigh any particular fact in the capital sentencing decision. ■ "Indeed, we have repeatedly held that 'trial courts are not required to identify particular sentencing factors as aggravating or mitigating and that the 1978 death penalty law is constitutional despite the absence of such a requirement.' " (*People v. Turner, supra,* 8 Cal.4th at p. 208; see also *People v. Pinholster, supra,* 1 Cal.4th at p. 973.)

Defendant adds that the penalty phase instructions in his case allowed the jury to consider previous guilt instructions on voluntary intoxication (CALJIC Nos. 4.20, 4.22), which informed the jury that intoxication did not negate the criminality of defendant's actions for the purpose of determining guilt. Defendant argues that, notwithstanding *penalty* instructions to the jury that it could consider whether intoxication impaired defendant's mental capacity in determining penalty, the jury could still view intoxication as one of the circumstances of the crime, and therefore treat it as aggravating, despite case law identifying intoxication as mitigating. But the mitigating nature of section 190.3, factors (d), (e), (f), (g), (h), and (k), "is clear even in the face of contrary argument." (*People v. Montiel* (1993) 5 Cal.4th 877, 944 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Here, it should be noted, the record reflects no argument by the prosecution that intoxication, whether from alcohol or marijuana, or any mental or emotional disturbance, should be considered as anything but mitigating. No reasonable likelihood appears that the jury misunderstood or misapplied the penalty instructions. (See *People v. Marshall, supra,* 13 Cal.4th at pp. 857-858 [despite trial court error in failing to instruct jury to consider evidence of defendant's intoxication in determining penalty, prosecution argument did not misdirect jury from considering relevant evidence of defendant's consumption of alcohol prior to offense].)

### 9. *Cumulative Prejudice in Guilt and Penalty Phases*

Defendant concludes his challenge to the penalty judgment by asserting that the cumulative effect of the errors he raises mandates reversal. Our review of the record leads us to a different conclusion. No errors are discernable. No reasonable possibility exists that the sentencing jury would have reached a different result absent any of the alleged errors.

## III. Disposition

We affirm the judgment in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied June 18, 2003, and the opinion was modified to read as printed above.